[No. 40883-6-I.    Division One.    August 24, 1998.]

*In the Matter of the Dependency of* H.W., ET AL.

THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*, v. CARLA BISSETT, *Appellant*.

*Jason B. Saunders* of *Washington Appellate Project*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Catherine Cruikshank, Assistant*, for respondent.

ELLINGTON, J. — A developmentally disabled mother of two girls appeals from an order terminating her parental rights. Because the Department of Social and Health Services (DSHS) has not established by clear, cogent, and convincing evidence that it offered all reasonably available services capable of correcting parental deficiencies, we reverse and remand for further proceedings.

## Facts

Carla Bissett and Anthony Walker are the biological parents of H.W. (age 10) and V.W. (age 8). The children are biracial; Ms. Bissett is Caucasian and Mr. Walker is African-American. Ms. Bissett is developmentally disabled and has an IQ of 65. Mr. Walker was convicted over 20 years ago for sex offenses involving three girls between the ages of 8 and 10. *State v. Walker*, 19 Wn. App. 881, 882, 578 P.2d 83, *review denied*, 90 Wn.2d 1023 (1978). Mr. Walker has had no further arrests or convictions for sex offenses and the record contains no allegation that Mr. Walker ever made sexual advances toward his own children.

Mr. Walker's niece (currently age 26), however, alleges

that Mr. Walker molested her when she was between the ages of 4 and 7 (or perhaps as old as 10). She reported these incidents to Child Protective Services (CPS) in 1991 (when she was 19), expressing concerns that Mr. Walker might be sexually abusing his children. An investigation conducted at that time revealed no evidence of sexual abuse involving H.W. or V.W. (then roughly ages three and one, respectively).

Approximately four years later, H.W. and V.W. were removed from Ms. Bissett's and Mr. Walker's home when police responded to a call from Mr. Walker, placed from a pay phone during the midst of an argument with Ms. Bissett. The police discovered the children alone in the home, which was filthy and smelled of rotting food; H.W. told one of the officers that Ms. Bissett had slapped, hit, and shaken her. The police arrested Ms. Bissett and placed the children with their paternal grandparents.

In late July 1995, the children were removed from their grandparents' care after they complained they were being physically abused by their grandmother. From August 1995 until February 1996, H.W. and V.W. were under the foster care of Eloise (Doe). During this period, the foster mother observed H.W. acting out sexually and displaying aggressive behavior. Also during this period, V.W.[1] made a suicide gesture; she held a steak knife and threatened to kill herself if she wasn't left alone. As a result of this episode, the girls began attending individual therapy sessions. V.W. was subsequently diagnosed with Adjustment Disorder.[2]

In February 1996, H.W. and V.W. were transferred to the

---

[1]In its response brief, DSHS incorrectly identified H.W. as suicidal, and in contrast, described V.W. as being "sad and withdrawn."

[2]Adjustment Disorder is characterized by the development of clinically significant emotional or behavioral symptoms in response to an identifiable psychosocial stressor or stressors. AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 623 (4th ed. 1994) [hereinafter DSM-IV]. The disturbance must begin within three months after the onset of the stressor(s) and generally lasts no longer than six months after the stressor or its consequences have ceased. DSM-IV at 623, 625. V.W.'s therapist opined that her Adjustment Disorder was related primarily to her separation from her parents and that the precipitating event for her suicide gesture was moving into foster care.

foster care of Angela (Doe), where they remained until the hearings in May 1997 on the petition for termination of parental rights filed by the Department of Social and Health Services. At those hearings, Angela stated that the children could stay with her until a permanent home was found for them, but that she was not in a position to adopt them herself. Angela further testified that she had observed no signs of sexual acting out, unusual aggression, or depression in the girls.

Throughout the period of their foster care, the children have had weekly, two-hour, supervised visits with Ms. Bissett and Mr. Walker. The visits took place at Common Ground, an agency contracted by DSHS to provide transportation and supervise visitations. Common Ground prepared and sent weekly reports to the DSHS social worker assigned to the case, most recently Robert Thornquist.[3] Mr. Thornquist never himself observed the parents and the children together. Based on Common Ground's reports, however, Mr. Thornquist testified that concerns were initially expressed about the parents' frequent picture-taking during the visits and their arguing in front of the children. Following feedback, the parents' behavior and the visits improved. The children were always glad to see their parents and were emotionally bonded to them.

In June 1997, the trial court entered an order terminating Ms. Bissett's and Mr. Walker's parental rights as to H.W. and V.W.[4] The trial court found that Mr. Walker is a convicted sex offender who refuses to acknowledge he has a problem and is therefore not a candidate for treatment. Without treatment, Mr. Walker was viewed by the trial court as "an enormous risk to his own children and to their friends." The trial court further found that Ms. Bis-

---

[3] A series of DSHS social workers have worked on this case; the three who testified at the termination hearings were: (i) Robert Thornquist, assigned to the case from approximately May 1996 to the present, (ii) Cora Phillips, who was involved from August 1995 to February 1996, and (iii) Maureen Walum, who worked on the case from October 1993 to June 1994.

[4] Ms. Bissett later gave birth to a son, who has since been declared a dependent child as to both Ms. Bissett and Mr. Walker.

sett, "because of her mental retardation, is not able to express a belief in or an understanding of the father's sexual deviancy." As a result, the trial court did not believe that Ms. Bissett could supply the vigilance required to protect H.W. and V.W.

In reaching its decision, the trial court observed that Ms. Bissett had participated in court-mandated anger management and parenting classes and had received in-home training on housecleaning and parenting issues. The trial court concluded that Ms. Bissett had been offered or provided all reasonably available services capable of correcting her parental deficiencies. The trial court further stated that, even assuming Ms. Bissett could make further progress, in light of her developmental disabilities, she would have difficulty parenting without another competent adult in the home or nearby. Because no coparent, other than Mr. Walker, had been identified, the trial court concluded that conditions were not likely to be remedied so as to make return of the children possible in the near future. The trial court therefore found that continuation of the parent-child relationship diminished H.W.'s and V.W.'s prospects for adoption and that termination was in their best interests. In so concluding, the trial court rejected Ms. Bissett's request that a long-time family friend, Bernice Henning, be appointed guardian for the children.[5] In the trial court's opinion, guardianship was a "pale substitute for the permanency these girls need."

Ms. Bissett has appealed from the order terminating her parental rights; Mr. Walker, however, did not appeal. Ms. Bissett contends that the trial court's findings relating to DSHS's offers of available services, the probability of remedying conditions, the prospects for adoption, and the best interests of the children are not supported by substantial evidence. She disputes DSHS's and the trial court's

---

[5]Ms. Henning testified that she would be willing to adopt or act as guardian for H.W. and V.W., although she preferred to adopt the children so that she would have less restrictions on traveling and moving. Ms. Henning further testified that she would be willing to allow Ms. Bissett to visit H.W. and V.W., and that she would abide by any orders concerning Mr. Walker's access to the children.

view of the testimony and the conclusions to be drawn therefrom. Ms. Bissett also argues that the termination of her parental rights violates the Americans with Disabilities Act (ADA) and due process.

In March 1998, DSHS filed a motion on the merits to affirm pursuant to RAP 18.14. The Commissioner denied the motion in June 1998. The case was set for oral argument on the next available calendar in light of Ms. Bissett's previously granted motion for accelerated review under RAP 18.13.

## Termination of Parental Rights

■ ■ An order terminating parental rights must be affirmed if substantial evidence supports the trial court's findings in light of the degree of proof required. *In re Welfare of S.V.B.*, 75 Wn. App. 762, 768, 880 P.2d 80 (1994); *In re Dependency of P.A.D.*, 58 Wn. App. 18, 25, 792 P.2d 159, *review denied*, 115 Wn.2d 1019, 802 P.2d 125 (1990). A court may terminate all parental rights to a child if it finds that: (i) all six statutorily required allegations of the petition seeking termination are established by clear, cogent, and convincing evidence; and (ii) termination is in the best interests of the child. RCW 13.34.190(1)(a) and (2). Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown to be "highly probable." *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).

■ The six termination factors must be established to the requisite degree of certainty before the court may focus on the best interests of the child. *In re Welfare of Churape*, 43 Wn. App. 634, 639, 719 P.2d 127 (1986). A determination that termination is in the best interests of the child must be supported by a preponderance of the evidence. *In re Welfare of A.J.R.*, 78 Wn. App. 222, 228, 896 P.2d 1298, *review denied*, 127 Wn.2d 1025, 904 P.2d 1157 (1995). The preponderance of the evidence standard requires that the evidence establish the proposition at issue is more probably true than not true. *In re Welfare of Sego*, 82 Wn.2d 736, 739 n.2, 513 P.2d 831 (1973).

Of the six findings required for termination of parental rights, the three of relevance here are:

> (4) That . . . all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided; and . . .

> (5) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; . . . and

> (6) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home; . . . .

RCW 13.34.180(4)-(6). Ms. Bissett contends that DSHS failed to prove these allegations by clear, cogent, and convincing evidence.

## Reasonably Available Services

■ Ms. Bissett argues that DSHS did not offer her all reasonably available services capable of correcting her parental deficiencies. We agree, especially in light of the "highly probable" standard of proof. Ms. Bissett did receive approximately three months of intensive home-support specialist services, six weeks of parenting classes, and anger-management training. An attempt was made to tailor these services to Ms. Bissett's special needs through the provision of hands-on and one-on-one training. Ms. Bissett, however, was never referred to the Division of Developmental Disabilities (DDD), a branch of DSHS, for potentially applicable services.[6] Mr. Thornquist, the social worker who signed the petition to terminate Ms. Bissett's parental rights, made absolutely no attempt to investigate what services might be available through DDD.[7] At the termination

---

[6] DSHS counters that Ms. Bissett refused a referral to DDD, citing the testimony of the guardian ad litem (GAL). DSHS, however, misconstrues the GAL's testimony. Ms. Bissett apparently had expressed disinterest in the job placement services offered by DDD. On cross-examination, the GAL equivocated on whether Ms. Bissett would ever be able to find a job that would equal or exceed her social security benefits and admitted that obtaining a job might jeopardize her social security income.

[7] After oral argument on this appeal, the Court received the declaration of Kord E. Roosen-Runge, a social worker at the Public Defender Association, who

hearing, Mr. Thornquist stated that referring adults to DDD was not common practice because DSHS's main focus was on providing services to the children involved.[8]

Ms. Bissett's case is in contrast to *In re Welfare of A.J.R.*, in which Division III affirmed an order terminating the parental rights of a moderately developmentally disabled mother and a borderline developmentally disabled father. 78 Wn. App. at 223-24. In *A.J.R.*, the mother received services from DDD; among these services was the assignment of an "alternative living provider," a private individual under contract with DDD who assists with cooking, cleaning, shopping, and personal hygiene. *Id.* at 224-25. In addition, a public health nurse provided intermittent in-home infant care for approximately eight months. *Id.* at 225. Recognizing the mother's limitations, the nurse offered step-by-step instructions on nutrition, health care, cleanliness, and child care. *Id.* She drew pictures describing the instructions and attached them to the refrigerator. *Id.*

The mother and father in *In re Welfare of A.J.R.* also attended parenting classes tailored to their needs. *Id.* at 227. Despite the provision of services modified to accommodate their disabilities, the parents continued to maintain a filthy home, which smelled of dog feces, urine, and dirty dishes. *Id.* The father, who had a history of chemical abuse and criminal activity, refused DDD services because of the associated stigma. *Id.* at 226, 228. At the parental rights termination hearing, 15 physicians, psychologists, detectives, social workers, and service providers testified that all reasonably available services had been offered or provided to the parents, *id.* at 225, and the apparent consensus was

has consulted with DDD on Ms. Bissett's behalf and learned that Ms. Bissett is eligible for DDD services, including enrollment in Family Support Services, an assisted-living program for disabled parents and their children.

[8]On cross-examination, Mr. Thornquist admitted that he was unfamiliar with the Family Preservation Services Act, chapter 74.14C RCW. In that Act, the Legislature directed DSHS to focus child welfare services on shortening or avoiding altogether out-of-home placement of children. RCW 74.14C.005(1). The Act authorizes DSHS to refer eligible families to in-home or community-based "family preservation services," but it does not create an entitlement to such services. RCW 74.14C.005(4); RCW 74.14C.040; RCW 74.14C.042.

that the available services could not correct the family's deficiencies in the near future and termination was in the best interests of the child, *id.* at 226-28.

In Ms. Bissett's case, the evidence is not so one sided. Carma Forbes, the instructor who provided individual anger management training to Ms. Bissett, testified that Ms. Bissett was able to learn the material and adjust her behavior both physically and verbally. Ms. Forbes observed that Ms. Bissett has a "resistant" learning style that is "concrete and experiential."[9] When Ms. Forbes would raise a new idea, Ms. Bissett would initially take a position of arguing against it, but then, as it would be discussed with reference to particular circumstances, Ms. Bissett would experiment and, if it worked, she would adopt it.

Maureen Walum, a social worker assigned to the case before H.W. and V.W. were removed from the home, who arranged for Ms. Bissett and Mr. Walker to receive home-support services and parenting classes, testified that Ms. Bissett was responsive to the training and was, in fact, eager for more services. According to Ms. Walum, both Ms. Bissett and Mr. Walker benefited somewhat from the home-support services and parenting classes, and she did not believe the children were at risk at the time she was transferred off the case.

In light of the above testimony, DSHS does not contend that Ms. Bissett is uneducable or unwilling to attend classes or receive services. Rather, DSHS argues that Ms. Bissett's attachment to Mr. Walker renders futile the provision of any further services. While DSHS's concerns over the risk Mr. Walker presents to his children might be well founded, they simply are not a substitute for clear, cogent, and convincing evidence that Ms. Bissett was offered or provided *all* reasonably available, potentially efficacious services.

The record establishes that Ms. Bissett was never offered

---

[9]Dr. Paul Johnson, the psychologist who evaluated Ms. Bissett at DSHS's request pursuant to the Shelter Care Order, agreed that Ms. Bissett's primary learning modality is hands-on instruction.

any services from DDD. In addition, she apparently was not offered training or counseling to assist her in understanding and identifying signs of sexual abuse.[10] Rather than providing such services, DSHS personnel seem to have assumed that Ms. Bissett lacked the ability to acquire and appropriately apply information concerning sexual abuse. Such assumptions, even if supported,[11] cannot justify the failure to make an attempt to assist in correcting perceived deficiencies. We therefore find DSHS's assertion of futility unconvincing.

DSHS vehemently argues that Ms. Bissett has proven herself incapable of correcting her parental deficiencies by failing to separate from Mr. Walker. This argument seems specious given that Mr. Walker testified he no longer lives with Ms. Bissett and the trial court so found. In addition, the trial court never ordered Ms. Bissett to cease contact with Mr. Walker, but rather specifically provided for joint visitations with the children.[12] In sum, although we do not disregard DSHS's concerns, the purpose of the statutory requirement that services be offered is precisely to determine whether such concerns are well founded. Given

---

[10]Cora Phillips, the social worker assigned to this case shortly after H.W. and V.W. were placed in foster care, testified that one common practice in cases in which a child has been sexually abused is to send the nonoffending parent to a support group. In a classic example of a "Catch-22," Ms. Phillips explained that she did not refer Ms. Bissett to such services because neither H.W. nor V.W. had alleged sexual abuse.

[11]Any assumption that Ms. Bissett did not understand the harmfulness of sexual abuse appears contradicted by Ms. Bissett's own testimony that she would "[p]robably kill" Mr. Walker if she discovered him touching the children inappropriately. In addition, DSHS's contention that Ms. Bissett could not protect the children from Mr. Walker is inconsistent with Mr. Thornquist's testimony that the arguments between Ms. Bissett and Mr. Walker during their initial supervised visits with the children were precipitated by Ms. Bissett's attempts to intervene when she believed Mr. Walker was teasing the children too harshly.

[12]DSHS also argues that Ms. Bissett's failure to take advantage of the offered opportunity to have unsupervised visits with the children if Mr. Walker was not present indicates an inability to separate from Mr. Walker. This contention is flawed, given that Mr. Thornquist (who was the contact person for over a year before the termination hearing) never discussed with Ms. Bissett the possibility that she could have unsupervised visits alone with the children, much less explained to her that her failure to take advantage of such opportunity could be evidence used against her in terminating her parental rights.

the lack of clear, cogent, and convincing evidence that DSHS even knew what services were available, much less offered them to Ms. Bissett, and in light of the parties' failure to explore the possibility of entering appropriate no-contact orders or instituting a monitoring scheme for assessing the children's well-being so they could be returned to Ms. Bissett's custody, we conclude that the termination of Ms. Bissett's parental rights was premature.

In light of our disposition of this matter, we do not address Ms. Bissett's ADA and due process arguments.

Reversed and remanded for further proceedings.

AGID, A.C.J., and WEBSTER, J., concur.

After modification, further reconsideration denied November 23, 1998.