IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Termination of: | ) | No. 32829-5-III |
| | ) | |
| | ) | |
| | ) | PUBLISHED OPINION |
| R.M.P.† | ) | |
| | ) | |
| | ) | |

LAWRENCE-BERREY, J. — RCW 13.34.136(2)(b)(i)(B) protects a disabled person's

parental rights by requiring the Department of Social and Health Services (Department) to

make reasonable efforts to consult with the Developmental Disabilities Administration

(DDA) to create an appropriate permanency plan to reunite parent and child. The primary

question on appeal is whether this subsection, enacted after the dependency proceeding

ended, applies to the related termination proceeding so that the Department's failure to

consult with the DDA requires reversal of the parental termination order. We answer the

primary question no, reject the parent's secondary arguments, and affirm the trial court's

termination order.

---

† For purposes of this opinion, the minor child's initials are used in place of her
name.

FACTS

A.    Events leading to dependency

R.M.P. was born May 21, 2008.  Her mother is S.S.B., and her father is D.B.[1]  The Department received two referrals involving this family prior to the referral establishing this dependency.  On February 11, 2008, the Department first received concerns from a person who was not sure if S.S.B. was getting prenatal care, and was worried about S.S.B.'s severe cognitive issues and S.S.B.'s capability to care for the child.  The Department did not investigate this referral.  On July 12, 2011, the Department received the second referral from two people, one of whom was a former roommate of S.S.B. and D.B.  The referents reported roaches, rats, and rotten food in the refrigerator because S.S.B. and D.B. did not pay their utility bill, causing the utility company to shut off their power.  The referents described D.B. as a methamphetamine user, but could not remember the last time he used.  There were no concerns about drug use by S.S.B.  The referents reported D.B. would have parties in the home, but S.S.B. would not participate in the drug use or drinking.  Police came to the home and arrested D.B. several times for domestic violence incidents between D.B. and S.S.B., and the police located two prior

---

[1] D.B. is not a party to this appeal.

restraining orders between D.B. and S.S.B. The Department did not investigate this referral because it was unable to contact the family.

On October 11, 2012, the Department received the referral leading to this dependency case. The referent stated four-year-old R.M.P. had severe global delays and functioned at a level of a two-year-old. The referent additionally stated R.M.P. was not toilet-trained, had no language skills, her teeth were rotten, had poor hygiene, had head lice, ate with her hands, and did not know how to wash her hands. A child protective services (CPS) worker visited R.M.P.'s home on October 12, 2012, and confirmed the allegations in the referral. The CPS worker also observed the home was unsanitary, had unknown debris on the floor, dishes piled in the kitchen, and food was sitting in the living room with flies on it, which S.S.B. indicated R.M.P. was eating. S.S.B. stated R.M.P. had not been to the doctor since June 2011, and thought R.M.P.'s speech problems would improve on their own. The CPS worker's impression was S.S.B. did not seem overly concerned about her daughter's teeth. R.M.P. had bruises on her right ear, and three deep bruises on different spots on her leg. The Department took R.M.P. into protective custody and placed her in licensed foster care. D.B. moved out of the home, and S.S.B. moved in with a family member.

The Department filed the dependency petition on October 16, 2012, and assigned Loni Conklin as the social worker. Ms. Conklin met with S.S.B. and the two talked about whether or not she was receiving DDA services, and focused on the domestic violence between S.S.B. and D.B. Based on that meeting, Ms. Conklin formulated a service plan for S.S.B. that included domestic violence counseling at the YWCA, early head start services with R.M.P., and individual parenting classes with Nancy Riggle at Valley Residential Services. This plan also required S.S.B. to obtain stable housing, attend visitations, maintain monthly contact with the Department, and set up an assessment with the DDA. S.S.B. began these services. On February 28, 2013, S.S.B. entered into an agreed order of dependency and the trial court ordered the same services Ms. Conklin outlined in her original service plan.

B.    S.S.B.'s engagement with services

For the first year after the Department took R.M.P. into protective custody, S.S.B. briefly lived with a family member, then stayed at a homeless women's shelter until she moved in with her grandmother. S.S.B. did not maintain contact with Ms. Conklin during this year, tended to change her number frequently to avoid being harassed by D.B., and did not always communicate her new number to the Department.

4

From December 7, 2012, to June 30, 2013, S.S.B. attended weekly parenting instruction classes with Nancy Riggle. During her initial assessments Ms. Riggle determined R.M.P., who was then four years old, functioned between 18 and 24 months developmentally—less than the first percentile—had severe 10-hour temper tantrums, and had no usable speech except the word no. Ms. Riggle worked with S.S.B. and R.M.P. together to develop structure and routine. S.S.B. completed 50 percent of her homework from the time she started working with Ms. Riggle through February 2013, and was completing 75 percent of her homework by March 2013.

Visitation occurred in three-hour sessions three days per week. S.S.B. attended nearly all visitations, and the court appointed special advocate (CASA) for R.M.P. testified S.S.B. was not always at fault for the occasional visit she missed. Ms. Conklin testified the visitation quality was quite good. However, R.M.P. would exhibit very significant behavioral issues after visits and revert back to her old behaviors, such as pulling her hair, head-banging, and eating off the floor.

On March 13, 2013, the Department took R.M.P. from her foster parent in Walla Walla and placed her with R.M.P.'s paternal grandmother in Clarkston, and the court adjusted visitation to a six-hour session every other Saturday. S.S.B.'s progress in services declined dramatically after R.M.P. went to Clarkston. Ms. Riggle stopped

5

classes with S.S.B. a few months afterward. Ms. Riggle testified, "[S.S.B.] just really lost her fire to continue working with me," and S.S.B. only completed 26 percent of her homework those last few months. Report of Proceedings (RP) at 33. Because S.S.B. was not making any progress toward the end of their sessions, Ms. Riggle believed another provider would be more successful and did not request a contract extension from the Department. Ms. Riggle believed S.S.B. would benefit from continued training, but not with her. The Department did not refer S.S.B. for additional parenting instruction services.

In the summer of 2013, S.S.B. began attending individual domestic violence counseling at the YWCA. S.S.B. attended regularly, until early 2014 when S.S.B.'s counselor resigned from her position. The YWCA counselor told the CASA that S.S.B. "still was really stuck on fantasies of having a happy family and being an amazing mother and that it was hard for her to get off of that and think about what needed to happen next." RP at 138.

On October 24, 2013, S.S.B. independently requested parenting classes from Children's Home Society. She attended 26 classes with a parent aide from December 5, 2013, to July 24, 2014. These classes did not involve R.M.P. because Children's Home Society did not have the financial resources to travel to Clarkston.

Ms. Conklin arranged two, two-hour meetings between S.S.B., herself, and the CASA. The meetings occurred March 15 and March 21, 2014. These meetings were specifically designed to determine whether S.S.B. could articulate what R.M.P.'s very unique and special needs were because of R.M.P.'s developmental delays. From these meetings, Ms. Conklin concluded S.S.B. was unable to describe what a day in the life of R.M.P. would look like and how she would address R.M.P.'s special needs, such as brushing R.M.P.'s teeth, getting her to school and therapy appointments, or how S.S.B. would respond if R.M.P. got sick.

R.M.P. began improving drastically after the Department initially placed her in care. The foster parent toilet-trained R.M.P. in a weekend, worked on R.M.P.'s speech issues, and taught R.M.P. to brush her teeth. The paternal grandmother regularly took R.M.P. to therapy, and the motor, speech, and language reports from St. Joseph Regional Medical Center all indicated R.M.P. was improving. The CASA testified at trial that R.M.P. "has made great progress. She can use language to express her wants and her needs," that she has "personally . . . seen great progress in [R.M.P.'s] gross motor skills. . . . She moves more age appropriately now." RP at 51-52. R.M.P. "is no longer pulling her hair out, and her behavior is less extreme, and she is fitting in better." RP at 53-54. The CASA testified R.M.P. made great progress since the Department put her in

foster care, but still functions at a three-year-old level in terms of language and speech, and "is still seriously behind kids of her age" cognitively. RP at 52.

### C. Termination

The Department filed the termination petition on April 23, 2014. The Department requested a psychological evaluation from Dr. Ronald Page, a licensed clinical psychologist, requesting his opinion on various questions.[2] In his report dated May 6, 2014, Dr. Page stated S.S.B. has an IQ of 65, and functions within the bottom two percent of the population. In addition, Dr. Page diagnosed S.S.B. with mild mental retardation, avoidant personality disorder, and cyclothymia. Dr. Page's report concluded, "[t]o be an

---

[2] The Department's questions for Dr. Page were:

1. What is [S.S.B.'s] current health profile, including diagnoses of any disorders that may impact her ability to safely parent with her significantly [sic] other?

2. Do you believe [S.S.B.] is able to #1 identify the developmental needs of her daughter and #2 manager [sic] her daughter's needs on a daily basis (i.e. coordinate educational, medical, and therapeutic services necessary for her daughter)?

3. Do you feel that [S.S.B.] has the mental capacity, in terms of focus and comprehension, to learn, utilize, and maintain adequate parenting practices?

4. Is her tendency to minimize and/or avoid information about her daughter's and her own developmental delays an indicator of future neglect and/or abuse and how would that impact her ability to parent on a daily basis?

Ex. 2 at 8-9.

adequate parent for her daughter I believe [S.S.B.] will continue to need close oversight and assistance at least during the next few years." Ex. 2 at 10.

The termination trial occurred September 9-10, 2014. Dr. Page testified about his psychological evaluation of S.S.B and his reported findings. He concluded that S.S.B. could not currently parent R.M.P. safely. Dr. Page explained that S.S.B.'s cyclothymia makes her unstable emotionally and prone to short-lived bouts of anger or happiness, and that her avoidant personality disorder causes her to lack self-confidence. He also explained that S.S.B.'s low IQ limits her ability to solve novel problems, to assimilate complex skills, to multi-task, and to deal with more than one significant responsibility. Dr. Page acknowledged that while S.S.B. is bonded, affectionate, and appropriate in many respects in visiting her daughter, S.S.B. does not address the problems and issues that come up in an effective problem-solving fashion. Dr. Page testified to the additional services S.S.B. would need to parent R.M.P., and the length of time it would likely take for S.S.B to complete the services:

> [The length of time to complete the services] depends on the consistency of her effort. I'm a little pessimistic that she would follow through for more than a year or two. I think it would take a year or two of consistent effort on her part to at least demonstrate to me that she can maintain a path.
> . . . .
> . . . [Such services would be] for enhancing ego strength and adapted [repertoire], [and] would not necessarily be focused on parenting exclusively. It would be focused on her skill base; learning, getting a

9

driver's license, if that were appropriate, earning her GED, learning job skills, improving her literacy and mathematical skills, attending a women's support group for assertion training, developing skills . . . for [raising] herself [sic] worth. . . . [S]he obviously would need pretty close mentoring for a long time . . . . Optimistically, I think a year or two.

RP at 19.

Ms. Riggle testified she believed "[S.S.B.] made progress," but did not know whether "the progress [was] enough to justify them being together as mother and child." RP at 36. Ms. Riggle did not think R.M.P. could overcome her "very significant delays" if she lived in S.S.B.'s home. RP at 43. The CASA concluded that while there "is a significant bond between mother and daughter," termination was in R.M.P.'s best interest, as "[t]he skill level and the intensity and the severity of [R.M.P.'s] need[s] is still, I think, beyond what [S.S.B.] can do." RP at 59, 56.

Ms. Conklin acknowledged S.S.B. was in compliance with all court orders at the time of the termination trial, and had also been in compliance at the April 11, 2014 review hearing. Ms. Conklin testified S.S.B. was unfit to parent R.M.P., as she did not believe that S.S.B. was able to take on the responsibilities of parenting on a regular daily basis without reverting back to the reasons that R.M.P. was removed from the home in the first place. Ms. Conklin believed it would take S.S.B. between three and five years to remedy her parental deficiencies and that this was too long. All of the Department's witnesses

10

testified S.S.B. had shown insufficient progress and would either have difficulty parenting or be incapable of parenting if R.M.P. were returned home in the near future.

S.S.B. testified at trial. She testified she does all her own cooking, cleaning, and manages her own finances. She ended her relationship with D.B. when the Department took R.M.P. into protective custody and has not had any other romantic relationships since the dependency started. She testified she has a strained relationship with R.M.P.'s parental grandmother—the grandmother with whom R.M.P. is currently placed—because when the parental grandmother found out S.S.B. was pregnant in 2008, the grandmother alleged the baby was not her son's child and drove S.S.B. from Lewiston, Idaho, to Walla Walla and left her at a bus stop. S.S.B. concluded she had benefited from her services at the YWCA, Children's Home Society, and from Ms. Riggle, and believed she had made progress as a parent and could successfully parent R.M.P. S.S.B.'s uncle, Frank Blair, briefly testified he and the rest of S.S.B.'s family are involved and would support S.S.B. going forward.

Following presentation of the evidence and closing arguments, the trial court granted the Department's petition to terminate S.S.B.'s parental rights to R.M.P. In ordering termination, the trial court found that the Department had established each of the six elements contained in RCW 13.34.180(1) by clear, cogent, and convincing evidence.

The findings specifically listed the services offered or provided to S.S.B., and also listed the specific reasons supporting the trial court's finding that conditions could not be remedied so R.M.P. could be returned to S.S.B. in the near future. In addition, the court found that S.S.B. was unfit to parent, and termination was in R.M.P.'s best interests.

S.S.B. appeals.

## ANALYSIS

"Parents have a fundamental liberty and privacy interest in the care and custody of their children." *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995). Thus, terminating parental rights should be allowed only "for the most powerful reasons." *Id.* (internal quotation marks omitted) (quoting *In re Sego*, 82 Wn.2d 736, 738, 513 P.2d 831 (1973)).

Washington courts use a two-step process when deciding whether to terminate parental rights. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010) (citing RCW 13.34.180(1); RCW 13.34.190). First, the Department must show that the statutory requirements in RCW 13.34.180(1) are established by clear, cogent, and convincing evidence. *Id.* Second, the Department must show that termination is in the best interests of the child by a preponderance of the evidence. *Id.* (citing RCW 13.34.190). Only if the first step is satisfied may the court reach the second. *Id.*

The requirements of RCW 13.34.180(1) that must be satisfied by clear, cogent, and convincing evidence are:

>    (a) That the child has been found to be a dependent child;
>    (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
>    (c) That the child has been removed . . . from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
>    (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>    (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.
>    (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

A.   *Whether the Department's failure to consult with the DDA to create an appropriate plan for services in this case constitutes a failure of proof under RCW 13.34.180(1)(d)*

S.S.B. contends that the Department failed to show it provided all necessary services as required by RCW 13.34.180(1)(d). Her argument relies on RCW 13.34.136(2)(b)(i)(B). Subsection (B), effective June 12, 2014, provides in relevant part:

>    If a parent has a developmental disability . . . and that individual is eligible for services provided by the [DDA], the department shall make reasonable efforts to consult with the [DDA] to create an appropriate plan for services.

RCW 13.34.136(2)(b)(i)(B). S.S.B. argues that the trial court was required to apply that subsection to the termination proceeding because the subsection was effective prior to the September 2014 termination order. S.S.B. further argues that because the Department did not consult with the DDA when creating the service plan, the Department failed to show it offered or provided all necessary services as required by RCW 13.34.180(1)(d).

In support of her argument, S.S.B. relies on *In re Dependency of A.M.M.*, 182 Wn. App. 776, 332 P.3d 500 (2014). There, the *A.M.M.* court discussed the impact of RCW 13.34.180(1)(f)'s amendments becoming effective during the course of the termination trial. The amendment required the trial court to consider whether an incarcerated parent maintained a meaningful role in his or her child's life, and whether the Department made reasonable efforts in assisting the incarcerated parent. Likely because the amendment was so recent, the trial court failed to consider the new factor in its termination order. The *A.M.M.* court held that the recent amendment applied to the termination proceeding, so that the trial court's failure to consider the new factor in its termination order required reversal of the order. *A.M.M.*, 182 Wn. App. at 787. We disagree that RCW 13.34.136(2)(b)(i)(B), which was not effective until after the dependency ended, applies to the Department's proof in this termination proceeding.

RCW 13.34.136 is entitled "Permanency plan of care." By its terms, RCW 13.34.136 is concerned with the permanency plan for services ordered by the court during a dependency proceeding. Here, the dependency proceeding had ended and the termination proceeding had commenced two months prior to the June 12, 2014 effective date of the amendment. In the absence of statutory authority, we will not imply that the legislature intended trial courts to dismiss a termination proceeding and reinstitute a dependency proceeding to comply with a new permanency plan standard.

Moreover, S.S.B.'s reliance on *A.M.M.* is misplaced. In *A.M.M.*, the court addressed the legislature's amendment to RCW 13.34.180(1)(f), which applies to termination proceedings. Here, the legislature amended RCW 13.34.136, which applies to dependency proceedings. We hold that the 2014 amendment to RCW 13.34.136 does not affect the Department's proof in this termination case because the amendment was not effective until June 2014, two months after the dependency proceeding ended.

B.     *Whether the Department's failure to offer or provide the services identified in Dr. Page's testimony requires reversal of the termination order*

S.S.B. argues that the Department's failure to offer or provide the services identified by the Department's psychologist, Dr. Page, constitutes a failure of proof that all necessary services were offered or provided, as required under RCW 13.34.180(1)(d).

Toward the end of its direct examination of Dr. Page, the Department asked what services S.S.B. might need and the length of time it would take to remedy her parental deficiencies. Dr. Page described numerous services designed to improve S.S.B's skill base and self-esteem. However, he expressed doubt as to whether S.S.B. could provide the consistent effort needed to successfully complete the services.

S.S.B. counters that despite her considerable limitations, she strived to do everything that the Department asked of her. She attended and timely arrived at scheduled visitations and meetings. She participated in parenting instruction, attended domestic violence classes through the YWCA for six months, and even secured independent housing for herself soon after the dependency ended.

The trial court considered and weighed all of this evidence at trial, and while acknowledging S.S.B.'s progress, found:

> . . . [D]ue to the mother's developmental disabilities, *there is no treatment that would render the mother capable of parenting in the near future.* While she has made some very slow progress during the nearly two years since the child's placement, that progress is insufficient to remedy the parental deficiencies that led to placement, the mother is still currently unfit to parent and it is unlikely that she will be fit to parent in the near future.

Clerk's Papers at 41 (Finding of Fact 2.3(e)(33)) (emphasis added).

S.S.B. cites *In re Dependency of H.W.*, 92 Wn. App. 420, 961 P.2d 963 (1998), to support her argument that the Department cannot establish futility. In *H.W.*, the mother

16

was developmentally disabled and qualified for services from DDA. *Id.* at 426 n.7. The mother in *H.W.* had only been provided services for three to four months and expert testimony supported her ability to learn. *Id.* at 426, 428. In contrast, here, the Department spent 18 months from late October 2012 through late April 2014 providing services to S.S.B. Moreover, although the parents in both cases suffered from a very low IQ, S.S.B. faced the additional challenges of having diagnosed disorders and R.M.P., herself, was a special needs child. Finally, and significantly, none of the experts at trial testified that S.S.B. could learn to be an adequate parent in the near future. We conclude that sufficient evidence supports the trial court's determination that the Department showed by clear, cogent, and convincing evidence that it offered or provided all necessary services to S.S.B., and that the additional services testified to by Dr. Page would have been futile.

C.   *Whether the trial court erred in finding terminating S.S.B.'s parental rights was in R.M.P.'s best interests*

S.S.B. argues that the Department did not show, by a preponderance of the evidence, that terminating S.S.B's parental rights was in R.M.P.'s best interests. When the factors of RCW 13.34.180(1) are proved by clear, cogent, and convincing evidence, the trial court must determine whether the State proved by a preponderance of the evidence that termination is in the child's best interests. *A.B.*, 168 Wn.2d at 911. Though

17

it is never easy to terminate parental rights when the parent cares for the child and desires to be a good parent, the overriding goal of a termination proceeding is to serve the child's best interests. *In re A.W.*, 53 Wn. App. 22, 32-33, 765 P.2d 307 (1988).

Here, S.S.B. has been unable to correct her parental deficiencies throughout 18 months of dependency proceedings. Dr. Page stated in his report that S.S.B. "could conceivably mature emotionally to the point of adequacy. However, it may not be a reasonable risk in the best interest of her daughter to assume that [she] now has reached a turning point, and would not regress." Ex. 2 at 10. Dr. Page testified that S.S.B. has not shown she could satisfactorily care for R.M.P.'s heightened therapeutic, educational, and medical needs.

As for R.M.P., she has greatly improved since the Department placed her in care with her paternal grandmother. The grandmother regularly takes R.M.P. to therapy, and the motor, speech, and language reports from St. Joseph Regional Medical Center all indicate R.M.P. is dramatically improving. The CASA testified that R.M.P. has made great progress, and can now use language to express her wants and her needs. The CASA also testified, "At this point I think [R.M.P.'s] current placement with the grandmother in Clarkston is in her best interest. . . . [T]he needs that I've just detailed . . . are there, with the backup for medical and education and all of those resources that are being

18

utilized. . . . At this point I'm not seeing those factors possible in [S.S.B.'s] living situation." RP at 57.

Ms. Conklin also testified termination was in R.M.P.'s best interests. Ms. Conklin testified that R.M.P. exhibits very significant behavioral issues after visits, and that keeping the parent/child relationship legally alive diminishes R.M.P.'s ability to integrate into a safe, stable, and permanent home. We hold there is substantial evidence to support the trial court's finding that termination is in R.M.P.'s best interests.

Affirmed.

Lawrence-Berrey, J.

WE CONCUR:

Korsmo, J.

Fearing, J.