**FILED**
**March 1, 2016**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| In the Matter of the Welfare of<br><br>D.B., T.C., and K.F. | )<br>)  No. 32975-5-III<br>)  (consol. with<br>)  No. 32976-3-III,<br>)  No. 32977-1-III)<br>)<br>)<br>)  UNPUBLISHED OPINION |

SIDDOWAY, C.J. — The trial court terminated B.B.'s parental rights as to her three children. B.B. appeals. She argues the trial court erred when it found (1) that the Department of Social and Health Services (Department) provided her with all necessary services under RCW 13.34.180(1)(d) because the Department did not provide her with integrated treatment for her co-occurring mental health and substance abuse issues, and (2) that it was in her children's best interests to terminate her parental rights. Because the Department offered B.B. several co-occurring treatment options, and because it is in the children's best interests to terminate B.B.'s parental rights, we affirm.

FACTS

B.B. is the mother of three children: K.F., T.C., and D.B. The Department became involved with the family in August 2011. Between August 2011 and March 2012, "the Department received eight separate referrals[. T]wo alleged physical abuse, but the majority were for neglect, such as the children not receiving enough to eat, the

cleanliness of the home, concerns about [B.B.'s] behavior around the kids, and substance abuse." Clerk's Papers (CP) at 358-59. B.B. confessed on one occasion that she had "smoked spice, methamphetamines and marijuana" at a party with her children. CP at 359. B.B. participated in voluntary services, including family preservation services, urinalysis (UA) screening for drugs, and a screening at Spokane Mental Health. When the voluntary services agreement expired in May 2012, the Department closed its case.

In October 2012, the Department received another referral for unsanitary conditions in the home and concerns about B.B.'s behavior with D.B. When social worker Anna Schultz viewed the home she found piles of dirty dishes in the sink with flies circling around them, and debris and food on the floor. "The basement had been flooded from [D.B.] plugging the toilet." CP at 360. "[B.B.] was extremely agitated and yelling profanities. She insisted her house was clean and that she had been cleaning." *Id.* Ms. Schultz was worried about B.B.'s mental health, but B.B. refused to attend counseling. Ms. Schultz filed a dependency petition on November 21, 2012.

A shelter care order was entered on November 27, 2012, under which the children were allowed to remain in the home because B.B. agreed to intensive family preservation services, followed by family preservation services, UA and breath alcohol testing, a chemical dependency assessment if there was ever a positive UA, mental health treatment with Carla Paullin, and to take D.B. to counseling.

2

That same day, intensive family preservation services began with therapist Shaylyn Gunnels. Ms. Gunnels tried to build rapport with B.B., but B.B. was hostile and verbally combative, did not want Ms. Gunnels to be the therapist, and was unwilling to explore appropriate behavior management techniques. B.B. made no progress in the four sessions with Ms. Gunnels, and on December 3, 2012, Ms. Gunnels notified B.B. she would be unable to continue providing services to her.

Ms. Schultz obtained an order to remove the children on December 5, 2012, and another shelter care hearing was held. At that hearing, the children were ordered to remain out of the home. "[B.B.] again agreed to [intensive family preservation services], UA testing, a chemical dependency assessment if a UA was dirty or she failed to appear, mental health counseling with [Carla Paullin], and counseling for [D.B.]." CP at 365. The children were found dependent on January 24, 2013. The Department filed a petition to terminate B.B.'s parental rights more than a year and a half after the children's removal from the home, on October 1, 2013. Between the beginning of the dependency in January 2013 until the trial court ultimately terminated B.B.'s parental rights, B.B. attended the provided services only sporadically, often refused services, and made little progress on her mental health and substance abuse issues.

More than another year had passed when, on November 17, 2014, the trial court found that all six requirements of RCW 13.34.180(1) were satisfied by clear, cogent, and

3

convincing evidence, and that terminating B.B.'s parental rights was in the best interests of the children. B.B. appeals.

## ANALYSIS

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Because of this fundamental liberty interest, the State may terminate parental rights "'only for the most powerful [of] reasons.'" *In re S.J.*, 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (alteration in original) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

Washington uses a two-step process to determine whether to terminate parental rights. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). "The first step focuses on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence." *Id.* (footnote omitted). The State must establish the six statutory elements listed in RCW 13.34.180(1) and make a finding that the parent is presently unfit. RCW 13.34.190(1)(a)(i). Here, only one of the six elements under RCW 13.34.180(1) is challenged on appeal:

> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental

4

deficiencies within the foreseeable future have been expressly and understandably offered or provided.

RCW 13.34.180(1)(d). "Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable." *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999).

"The second step focuses on the child's best interests and need be proved by only a preponderance of the evidence." *A.B.*, 168 Wn.2d at 911 (footnote omitted); RCW 13.34.190(1)(b). The court may not reach the second step unless the first step has been satisfied. *Id.* at 911.

## STANDARD OF REVIEW

This court reviews an order terminating parental rights de novo. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 574, 257 P.3d 522 (2011). "The court's factual findings must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *K.S.C.*, 137 Wn.2d at 925. Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the fact at issue. *S.J.*, 162 Wn. App. at 881. "The trial judge has the advantage of having the witnesses before him or her, and deference to the findings is of particular importance in deprivation proceedings." *K.S.C.*, 137 Wn.2d at 925. "Unchallenged findings of fact are verities on appeal." *In re Welfare of A.W.*, 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

5

No. 32975-5-III (consol. w/ No. 32976-3-III, No. 32977-1-III)
*In re the Welfare of D.B.*

## ASSIGNMENTS OF ERROR

The issues on appeal are whether the State provided B.B. with all necessary services under RCW 13.34.180(1)(d), and whether it is in her children's best interests to terminate her parental rights.

### *I. The State Provided All Necessary Services*

B.B. argues that the State did not provide her with all necessary services because it failed to provide her with integrated treatment for her co-occurring mental health and substance abuse issues.

To terminate parental rights, the State must prove that it offered all necessary services capable of correcting the specific parental deficiencies within the foreseeable future. RCW 13.34.180(1)(d). "The services offered must be tailored to each individual's needs," *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001), and they must be offered in a timely manner, *S.J.*, 162 Wn. App. at 881-83.

It is well settled that the statutory requirement to offer corrective services does not contemplate an entirely one-way process, and "a parent's unwillingness or inability to make use of the services provided excuses the State from offering extra services that might have been helpful." *In re Dependency of Ramquist*, 52 Wn. App. 854, 861, 765 P.2d 30 (1988).

6

Even where the Department inexplicably fails to offer services to a parent, termination will still be deemed appropriate if the services would not have remedied the parent's deficiencies in the foreseeable future. *In re Welfare of M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008). "Where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services." *Id.* (citing *In re Welfare of Ferguson*, 32 Wn. App. 865, 869-70, 650 P.2d 1118 (1982), *rev'd on other grounds*, 98 Wn.2d 589, 656 P.2d 503 (1983)).

While B.B. contends that the State did not offer her co-occurring treatment, the trial court's unchallenged findings of fact show otherwise. The record demonstrates that Ms. Paullin, a therapist who was selected for her expertise in co-occurring disorders, attempted to work with B.B. on her mental health disorder through cognitive behavioral therapy, and also attempted to get B.B. to attend treatment for chemical dependency. B.B. resisted both.

> [B.B.] was unwilling to acknowledge, or even pretend, that she had to change her way of thinking, to engage in counseling or other services. [B.B.'s] view was the Department wanted her kids[,] that it wasn't about parenting, that she had cleaned her dirty house, and there were no other reasons for concern.

CP at 368.

A chemical dependency counselor tried three separate times to help B.B. access health insurance so she could obtain co-occurring treatment, but B.B. missed all three appointments. The counselor testified that, while co-occurring treatment is limited in

7

Washington, had B.B. secured medical insurance, she would have had access to the treatment.

Social worker Lori Blake tried to convince B.B. to go to inpatient treatment. In fact, three beds at inpatient programs that apparently could have addressed B.B.'s co-occurring condition opened, but B.B. refused to participate in those programs at the times the beds were available. When B.B. finally agreed to go to inpatient treatment, the only open bed was at Pioneer Center East (PCE), a chemical dependency treatment center that does not provide co-occurring treatment.

Even after treatment at PCE, B.B. received numerous referrals. She was again referred to Ms. Paullin for counseling. She was also referred to Youth, Family, Adult Connections (YFA) for their "co-occurring disorder intensive outpatient group," and to Frontier Behavioral Health for a mental health referral and self-help groups. CP at 374, 383. She was an hour late for her intake appointment at YFA, and only attended two other appointments (and at one of them she left early). She did not attend the remaining nine appointments. B.B. also failed to re-engage in counseling with Ms. Paullin. The record contains clear, cogent, and convincing evidence that B.B. was offered co-occurring treatment options on multiple occasions.

Even if the Department had failed to offer co-occurring treatment options, B.B.'s unwillingness to engage with services or recognize her mental health and substance abuse issues make it clear such treatment would have been futile. In addition to B.B.'s failure

8

to engage in the co-occurring services just mentioned, B.B. failed to actively engage in any of the other services offered. During the approximately nine months B.B. was scheduled for UA testing, she missed 25 appointments. While she did attend six UA tests, two were positive for drugs, and one was invalid due to low creatinine. And though B.B. more consistently attended her counseling sessions with Ms. Paullin (attending 13 of 21 sessions), she never actively engaged with counseling and refused to accept she had a problem.

Similarly, when B.B. was referred to a counselor at B.B.'s attorney's request, B.B. missed her two and only appointments. While B.B. did attend seven of eight appointments with clinical psychologist Dr. Sean Smitham, as soon as he discussed her schizophrenia with her, she discontinued treatment. The overwhelming consensus of her various health care providers and social workers was that she was unwilling to accept she had a problem, and refused to actively engage in services to correct her parental deficiencies. Thus, the Department was not required to provide additional services.

B.B.'s arguments based on *In re Dependency of H.W.*, 92 Wn. App. 420, 961 P.2d 963, *amended on recons. by sub nom. In re Dependency of H.W. & V.W.*, 969 P.2d 1082 (1998), and *S.J.*, 162 Wn. App. 873, are not persuasive. In *H.W.* the father was a convicted sex offender and the mother was developmentally disabled. 92 Wn. App. at 421. The Department assumed the mother could not protect the children from sexual abuse because she was too attached to the father to understand his sexual deviancy. *Id.* at

9

423-24. Consequently, the Department never referred the mother to the Division of Developmental Disabilities for potentially applicable services. *Id.* at 426. However, the evidence showed that the mother was able to learn new material, adjust her behavior, and was eager for more services. *Id.* at 428. The court ultimately found that all necessary services were not offered. *Id.* at 429-30.

In *S.J.*, the mother had a bipolar disorder and substance abuse issues. 162 Wn. App. at 876. Despite knowing of her mental health issues, the Department did not refer her to mental health services until eight months after S.J. was removed from the home, during which time the mother unsuccessfully attempted to complete inpatient treatment for substance abuse three times. *Id.* at 876-77.

However, soon after receiving mental health services—in which she actively participated and improved her ability to identify symptoms of a bipolar episode—the mother successfully completed inpatient treatment. *Id.* at 882. Thereafter, the mother remained sober, implemented the suggested parenting skills, and established a safe, clean, drug-free home. *Id.* at 877, 883. The court found the mother's inability to complete inpatient treatment was linked to her bipolar disorder, and that if the Department had offered her co-occurring treatment sooner, she would have been able to recover in time to properly parent her child. The court found the Department had not offered all the necessary services. *Id.* at 882, 884.

This case is distinguishable from *H.W.* for two reasons. First, while the mother in *H.W.* was eager for services and tried to implement techniques she learned, here B.B. frequently refused or failed to attend services, and would not acknowledge she had a problem the services could help remedy. Second, while the mother in *H.W.* was never offered disability services, B.B. was offered co-occurring treatment both before and after entering inpatient treatment.

*S.J.* is likewise distinguishable from this case for two reasons. First, while the mother in *S.J.* received no mental health counseling until eight months after her child was removed, here B.B. received multiple referrals to mental health, substance abuse, and co-occurring treatment programs. She received mental health counseling from Ms. Paullin the same month her children were removed and was encouraged to go to chemical dependency treatment within a month of starting that counseling. B.B. was offered access to insurance to obtain co-occurring treatment, but she missed three appointments to help her enroll. B.B. refused three beds at inpatient treatment centers that apparently could have accommodated her co-occurring disorder. After inpatient chemical dependency treatment, B.B. was again offered counseling with Ms. Paullin, and co-occurring treatment at YFA, but she either sporadically attended or did not attend at all.

Second, while the mother in *S.J.* actively engaged in mental health sessions and implemented suggested parenting skills, B.B. consistently failed to engage in the provided services, and showed little to no ability to accept that her problems with mental

11

illness and substance abuse were the reason her children were removed from her care. Therefore, neither *H.W.* nor *S.J.* require this court to find the Department failed to offer B.B. all necessary services.

In fact, this case is most like *Ramquist*, 52 Wn. App. 854. In *Ramquist*, the mother suffered from schizophrenia. *Id.* at 856. She received regular counseling, was informed of classes near her home (one of which she completed), and was prescribed medication. *Id.* at 861. Despite these services, the mother's doctors and her caseworker testified that her parental deficiencies were untreatable and would not be remedied by further services. *Id.* at 861. There the court found the Department offered all necessary services. *Id.*

Here, B.B. was offered a variety of treatments, both sequential and co-occurring, and she failed to engage in or benefit from any of them. And like in *Ramquist*, B.B.'s health care providers and caseworkers all testified that B.B. was resistant to counseling, attended infrequently, and would not acknowledge her problems. There is no service that can make someone acknowledge a problem, and without acknowledging her problems, B.B. is untreatable. Thus, the trial court properly found the Department provided all necessary services.

## II. The Children's Best Interests

Here, B.B. assigns error to the trial court's finding that terminating her parental rights was in her children's best interests. Because she fails to make argument or cite to

12

any authority to support her assignment of error, she has abandoned the challenge. *See In re the Dependency of C.T.*, 59 Wn. App. 490, 500, 798 P.2d 1170 (1990).

The outcome would be the same had B.B. properly argued the issue. All of the children have significant needs that require a consistent parent who provides a safe stable home, and recognizes their need for treatment and appropriate behavior management. Where B.B. is unable to recognize her parental deficiencies or acknowledge her own need for mental health and substance abuse treatment, she will be unable to provide the home the children need to be able to recover and thrive. Accordingly, it is in the children's best interests that B.B.'s parental rights be terminated.

We affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Fearing, J.

_____
Lawrence-Berrey, J.

13