# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of L.R. (dob: 11/23/13) and J-L.R. (dob: 11/23/13), | ) ) ) ) | No. 75892-6-I (consolidated with No. 75893-4-I) |
| Minors. | ) ) ) | DIVISION ONE |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | ) ) ) ) | |
| Respondent, | ) ) | UNPUBLISHED |
| v. | ) ) ) ) | FILED: July 31, 2017 |
| LAQUISHA REED, | ) ) ) ) | |
| Appellant. | ) ) ) | |

Cox, J. — Following a series of dependencies during which Laquisha Reed made little progress with court-ordered services, the superior court entered orders terminating her parental rights to four of her six children.[1] Reed appeals the court's most recent order terminating her rights to her two youngest children, L.R. and J-L.R. With one possible exception, the Department of Social and Health Services (Department) carried its burden of understandably offering or providing all necessary services. To the extent it failed to understandably offer a portion of one service, we conclude that service would have been futile. And

---

[1] Reed voluntarily relinquished her parental rights to a fifth child and the sixth died in a fall from her apartment window.

contrary to Reed's assertions, proof of reasonably competent case management is not part of the Department's burden in this termination proceeding. We affirm.

Reed is the biological mother of H.C., A.C., H.R., O.M. and the subjects of this action, twins L.R. and J-L.R.

In 2008, Reed's oldest child, H.C., died after falling from Reed's apartment window. Shortly thereafter, the Department filed a dependency petition as to A.C. based on allegations of parental neglect and substance abuse. Reed engaged in services and the court denied the petition.

In 2010, the Department filed a second dependency petition regarding A.C. The court found that Reed left A.C. alone and crying in a hallway while using PCP, and that she had a "chronic, serious and untreated chemical dependency problem." Witnesses described Reed as "out of it", "agitated, aggressive, disheveled, and disoriented" during the incident. The court found Reed's behavior "'eerily and tragically reminiscent'" of a 2008 incident in which she "needed to be restrained because of her violent aggression toward the [Emergency Medical Technicians]." The court declared A.C. dependent and ordered Reed to obtain a drug/alcohol evaluation, random urinalysis, and a psychological evaluation.

In February 2011, Reed gave birth to H.R. Reed tested positive for PCP at that time. In April 2011, the court entered a default dependency order as to H.R. and again ordered Reed to engage in a drug/alcohol evaluation, random urinalysis, and a psychological evaluation.

2

In April 2012, the court terminated Reed's parental rights to A.C. and H.R. Although Reed had obtained a substance abuse evaluation that recommended intensive outpatient treatment, she did not obtain the treatment or participate in a psychological evaluation. She also stopped visiting the children in 2011.

In October 2012, Reed gave birth to O.M. He tested positive for PCP and was treated for withdrawal. Two months later, the court declared O.M. dependent and ordered random urinalysis, a parenting assessment, a chemical dependency evaluation and any recommended treatment, and mental health counseling.

On November 23, 2013, Reed gave birth to L.R. and J-L.R., the twins at issue in this appeal. Given Reed's history of dependencies and substance abuse, the hospital alerted the Department.

In December 2013, the court sentenced Reed for a 2011 theft conviction and ordered her to enter inpatient substance abuse treatment. In January 2014, Reed entered treatment at Genesis House. She made progress in the program, but after a few months Genesis House announced it was closing due to budget issues. Staff informed program participants they would be placed in other programs. Nevertheless, and against the advice of her chemical dependency counselor and Department caseworker, Reed left the program.

In June 2014, the court entered an agreed order of dependency as to L.R. and J-L.R. The order required Reed to engage in parenting classes, urinalysis, inpatient or intensive outpatient treatment, and a psychological evaluation and

any recommended treatment. The court found that "[t]he parent . . . understands the terms of the order he/she signed, including his/her responsibility to participate in remedial services in the below dispositional order." The psychological evaluation resulted in a recommendation for chemical dependency treatment, and mental health therapy using Cognitive Behavioral Therapy (CBT) and Dialectical Behavioral Therapy (DBT).

The first dependency review order stated that Reed made partial progress with services but that progress had "recently fallen off and court is concerned." Subsequent orders indicated Reed's visits were declining and she was generally not making progress with services.

In January 2016, the Department filed a petition to terminate Reed's parental rights to the twins.

Trial commenced in August 2016. Department social worker Patricia Gordon testified that she became Reed's caseworker near the end of her first dependency. She continued in that role until October 2015.

Gordon testified that during the dependencies involving O.M., L.R. and J-L.R., she told Reed how to access services in both service letters and conversations. Gordon identified a September 14, 2014 letter she hand delivered to Reed regarding her progress with services. The letter stated that Reed completed a psychological evaluation with Dr. Tatyana Shepel but had not contacted the prosecutor's office to establish paternity and had completed only two UAs. The letter also said "[i]t is unclear if you have completed you[r] intake

and are currently following through with [mental health counseling]." The letter expressly directed Reed to Sound Mental Health ("SMH") for her mental health services. Gordon ended the letter by encouraging Reed to "find the motivation to re-engage in your services." Gordon identified Reed's signature on the letter and testified that Reed signed it in her presence.

One month later, Gordon delivered another letter to Reed that encouraged her to restart her urinalysis. Gordon sent Reed separate letters regarding visitation.

In early 2015, Gordon sent Reed letters explaining that the phone numbers she gave Gordon were not working. Gordon encouraged her to get a free phone at the Department office. Gordon also asked Reed to call and set up a meeting to discuss her services. Several months later, Gordon informed Reed by letter that she had missed the meeting and needed to schedule another one. Gordon also warned her about missed visits with the twins and the possibility that her visitation contract would be cancelled.

Gordon subsequently informed Reed by letter that her phone numbers were not in service and that she needed a contact number or e-mail address. She had frequent conversations with Reed "about the importance of being able to [have] contact with her."[2] To Gordon's knowledge, Reed never applied for a free phone.

_____
[2] Report of Proceedings (RP) (August 29, 2016) at 62.

5

By letter dated July 30, 2015, Gordon expressed more concern about Reed's failure to engage in services. The letter stated that Reed had not contacted the prosecutor's office to establish paternity, had not started the DBT therapy recommended by Dr. Shepel, and was not in compliance with chemical dependency treatment and urinalysis requirements. Like the September 2014 letter, the July 30, 2015 letter stated it was unclear whether Reed was complying with her mental health service requirement. The letter ended with the following:

> Laquisha, please find the motivation to re-engage in your services. PLEASE let me know how I can assist you. *We have had many conversations about your services and re-engagement* and our last conversation in-person was on 6/16/2015 and we scheduled a meeting for 6/22/15 at 1 pm. You were a "no show" 6/16/15 and [for] our previously scheduled meeting . . . .[3]

When asked if Reed responded regarding "any of these services . . . you noted in this letter," Gordon said "I don't recall that she did."[4]

Gordon testified that Reed understood what she needed to do with respect to services. She recounted a conversation "with [Reed] over the phone when she was incarcerated and she had the twins – and I had sent her a packet of information – and she told me she was helping other people with finding resources, and that the packet I had sent was very helpful."[5] Gordon told Reed how and where to access services recommended by Dr. Shepel. Reed never

---

[3] Exhibit 17 (emphasis added).

[4] RP (August 29, 2016) at 65.

[5] Id. at 67.

expressed confusion about accessing services. Gordon testified that once Reed received a service referral, it was her obligation to make the initial contact with the service provider "because progress is shown by following through."[6]

With respect to chemical dependency treatment and urinalysis, Gordon testified that Reed did participate in inpatient treatment at Genesis House until the facility announced its closure. At that point, Gordon advised Reed to stay at Genesis House until they could create a transition plan for her. But Reed did not want to be in inpatient treatment and left the program without a plan. Despite referrals for urinalysis, Gordon never received confirmation that Reed completed the required 90 days of consecutively clean UAs.

Gordon testified that by the time she left the case in October 2015, Reed had not made any gains in remedying her parental deficiencies. She had not followed through with the recommendations in the psychological evaluation or engaged in urinalysis, and "[t]here was no way to tell . . . what her sobriety was like."[7] According to Gordon, the twins were adoptable and termination was in their best interests.

Peggy Hurd, a DSHS social worker, testified that she worked with Reed and the twins beginning in January 2016. Reed told Hurd she was participating in mental health and chemical dependency treatment at SMH. Hurd could not confirm Reed's participation because Reed had not signed a release of

---

[6] RP (September 7, 2016) at 561.

[7] RP (August 29, 2016) at 96.

information form. Hurd admitted that she forgot to "bring a release to a visitation when [Reed] was there."[8] Hurd testified, however, that when she asked Reed if she stayed for the sessions at SMH, Reed admitted she did not stay for the whole session.

Hurd testified that the twins are adoptable and that Reed is not ready to safely parent them. She said Reed would have to demonstrate at least six months of sobriety and progress in services before the children could be transitioned to her. But because the twins had "waited for over two years . . . to find a permanent home," and because they needed permanency, Hurd believed it was not in their best interests to wait another six months to see if Reed could comply with court-ordered services.[9]

Psychotherapist Amy Plumb performed a chemical dependency assessment of Reed at SMH in 2013. She concluded Reed suffered from PCP, cannabis, and nicotine dependence. A mental health assessment on file at that time stated that Reed had major depressive disorder, severe, with psychotic features. Plumb referred Reed for intensive outpatient treatment, which included a mental health component, and recommended that she continue her ongoing mental health treatment for grief and loss at SMH. A short time later, Reed's mental health case manager informed Plumb that Reed had decided to seek services elsewhere.

---

[8] Id. at 169.

[9] Id. at 180.

Leanne Sahli testified she met Reed in the intensive outpatient treatment program at New Traditions. The program consists of nine hours of group sessions, individual sessions with a counselor, eight sober support group meetings per month, and urinalysis. Reed attended four group sessions, one individual session, and ultimately did not complete the program.

Micah Kurtz, a Child and Family Services Supervisor, testified she supervised Reed's case for two years. Kurtz concluded termination was in the twins' best interests, stating:

> ... what I saw ... from multiple sources ... was a consistent message of the mother not participating in services, not completing services when she had started them, and visiting very irregularly. ... We have made services available to this mother for a long time on this case. And, the children need to have an opportunity to have a forever home sooner than later.[10]

Chemical Dependency Counselor Marissa Lindgren testified she performed an assessment of Reed in May 2014. She diagnosed Reed with PCP dependence and recommended three months of intensive outpatient treatment – the same treatment previously recommended by Genesis House when Reed discontinued her inpatient treatment.

Kathi Villaruz, the Court Appointed Special Advocate (CASA) for the twins, testified that the twins have special needs, including sensory issues and speech delays requiring speech therapy. She said Reed had been incarcerated four times during her term as CASA. Reed never contacted Villaruz despite having

---

[10] RP (August 31, 2016) at 383-84.

her phone number and e-mail address. Villaruz testified that Reed gave her "the impression . . . that she was working towards having an open adoption agreement," as opposed to reunification.[11]

Villaruz and other witnesses testified that Reed demonstrated a loving bond and appropriate parenting during visits with the twins. Reed, however, had only three visits in the six months before trial and Villaruz testified that consistent visits are necessary to "grow a stable base to . . . build on" and to provide permanence.[12]

Villaruz expressed concern regarding Reed's testimony "that she did not feel she needed any further chemical dependency treatment."[13] She noted there was no documentation whether Reed is clean and sober. Villaruz concluded that returning the children to Reed in the near future would not be safe and that her parental rights should be terminated. Termination would be in the twins' best interests because they will soon realize "the impermanence of their situation, and that would be very harmful to their development."[14]

Dr. Shepel, a clinical neuropsychologist, testified that she performed a neuropsychological evaluation of Reed in 2014 and observed her with the twins. She diagnosed Reed with major depressive disorder, substance abuse disorder,

---

[11] Id. at 423.

[12] Id. at 438.

[13] Id. at 436.

[14] Id. at 441.

posttraumatic stress disorder, cognitive disorder not otherwise specified, learning disorder not otherwise specified, personality disorder with paranoid and narcissistic traits, and intellectual functioning in the borderline range. Tests showed impairments for memory, attention, intellectual functioning, and other cognitive domains. Dr. Shepel testified that these deficits meant that Reed "may require more accommodations, more individualized treatment approaches, and longer participation in therapy and treatment and support . . . . But it doesn't preclude [her] from benefitting from services if there is motivation to attempt [to] follow through."[15] Dr. Shepel concluded that Reed "may not benefit from services because of very high level of resistance and denial, dishonesty, and also the history of relapses and quitting treatments, and not benefitting from previous treatments."[16] Dr. Shepel recommended that Reed participate in chemical dependency and mental health treatment, with the latter utilizing DBT and CBT. She further recommended that Reed receive accommodations for her cognitive deficits.

Hannah Harrison testified that she became Reed's case manager at SMH in August 2015. Although Harrison provides both case management and therapy at SMH, she characterized her role with Reed as "more of a case management role."[17] When Reed expressed an interest in being seen more often, Harrison

---

[15] RP (September 7, 2016) at 470.

[16] Id. at 478.

[17] Id. at 515.

11

referred her for assignment to an SMH therapist. She also referred Reed to housing and trauma groups and medication management. Asked if she took "any affirmative action with respect to providing any counseling" for Reed, Harrison said "I offered appointments with her, and she . . . was able to schedule with me. That was always an option."[18] Although she recalled discussions about meeting with Reed more often, she did not recall discussing whether the meetings would include counseling. She also conceded that her referral to an SMH therapist "fell through the cracks on [our] end . . . ."[19]

Harrison testified she used CBT with other patients and could have used it with Reed. Although she took classes in CBT in graduate school, she did not have a certificate in CBT. Harrison stated that a person could benefit from CBT only if they had regularly scheduled appointments. Reed missed appointments with Harrison and only attended three or four in the year prior to trial. Harrison testified that a DBT group was available at SMH, but she could not recall whether she referred Reed to that group.

Reed testified that Gordon made her aware of the required services and how to access them. When asked if she had any trouble understanding how to access services, Reed said "No. [Gordon] . . . sent letters. She did that part right."[20]

---

[18] Id. at 529.

[19] Id. at 530.

[20] RP (August 30, 2016) at 286.

12

Reed testified she started grief counseling at SMH after her son died in 2008. She started seeing Harrison at SMH because the Department required her to do that "to be a part of my kids' life."[21] She engaged in substance abuse treatment at Genesis House but left because the program was shutting down and "they didn't know where they were going to place us."[22] She tried treatment at SMH for about a month until she was discharged from the program. She also tried New Traditions but was terminated from the program after being incarcerated. She claimed she tried repeatedly to get another referral to New Traditions from caseworker Gordon, but her messages went unanswered because Gordon had been replaced by Peggy Hurd.

Reed eventually contacted Hurd but did not ask for a referral to New Traditions. She stopped seeking that referral because she wanted a program that would include her children. She conceded she was not currently engaged in drug and alcohol treatment but claimed she has not used PCP since January 2014. When asked if she believed she needed to complete a drug and alcohol program, Reed said "I don't believe that. And I've . . . never believed that . . . ."[23] Reed admitted that her visitation during the year preceding trial was adversely affected by her three incarcerations.

---

[21] Id. at 252.

[22] Id. at 256.

[23] Id. at 282.

13

After the Department rested, Reed moved to dismiss on the ground that the Department failed to prove that she was unfit to parent and that termination was in the twins' best interests. The court denied the motion.

On September 20, 2016, the court orally granted the termination petition, stating in part:

> Ms. Reed acknowledged during the termination trial that Social Worker Gordon had given her information regarding all of these services, and that she understood the need to complete these services. Of the services ordered by the Court, Ms. Reed completed only the age-appropriate parenting classes. She did submit to urinalysis testing, but on a sporadic and inadequate basis to determine if she is currently using any non-prescribed drugs. . . . Ms. Reed was given the opportunity to engage in chemical dependency and substance abuse treatment while she resided at Genesis House. Unfortunately, due to the impending closure of Genesis House, Ms. Reed decided to self-discharge from the treatment program there rather than completing the program until Genesis House closed and then have—and then transitioning to opportunities for further treatment at New Traditions.
> . . . [T]o date Ms. Reed has not completed court-ordered chemical dependency or substance abuse treatment.
> With respect to mental health evaluation treatment, this Court finds that the mother . . . has completed the . . . required evaluations.
> . . .
> To the mother's credit, [she] did engage with a counselor and case manager at Sound Mental Health, Hannah Harrison. However, the mother's contact with Sound Mental Health was sporadic and inconsistent. . . . The Court is concerned that Sound Mental Health failed to follow through on a referral for the mother to a regular mental health therapist at the facility. However, Ms. Harrison testified that she offered the mother the opportunity to have counseling sessions with her and would have been available had the mother followed through on—on contact with her, with "her" being Ms. Harrison.
> In conclusion, the Court finds by clear, cogent, and convincing evidence that the services necessary for the children to reunite with their mother were specifically and understandably identified for the mother. . . .

Subsection (e) provides that the Court must make a finding based upon State's evidence to clear, cogent, and convincing standard that there is little likelihood that conditions will be remedied so that the children can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within 12 months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the children can be returned to the parent in the near future. . . .

. . .

The mother has been in dependency proceedings with her various children since approximately 2008. The mother has been made well aware through this dependency, as well as the previous dependencies, of the need for her to seriously and consistently address her parental deficiencies in order to obtain reunification with her children. These children have been in foster care for nearly their entire lives, since their birth nearly three years ago. Under the statutory scheme of RCW 13.34.180, the rebuttable presumption set forth in this subsection would apply that there is little likelihood that conditions will be remedied so that the children can be returned to the parent in the near future. The State has made the necessary showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided. The mother has an established history of PCP use and dependence, which has not been demonstrably addressed by her. She has not engaged in and completed necessary programs to ensure the absence of ongoing use and reassurance that she does not relapse were her children to be returned to her. In addition, she failed to provide the urinalysis in order to ensure . . . her sobriety at this time, or during the course of the dependency.

. . .

The expert testimony at trial was that the mother could not likely complete services for another 12 to 18 months. Even assuming the mother were to engage in addressing these deficiencies immediately, the evidence at trial was that the recommended treatment for chemical—for the chemical dependency problem would be three months of inpatient treatment, followed by a minimum of another nine-plus months of intensive outpatient program. . . .

Under the best-case scenario, the mother could not address these parental deficiencies until a minimum of one year. However, given her previous failure to address these deficiencies during the prior dependencies, this Court questions whether the mother would,

15

in fact, be capable of doing so and following through to completion at this stage. Certainly, for children of nearly three years of age who have never lived with their mother, extending these dependencies for a minimum of another year with the attendant risks would not create the likelihood that these children could be returned to the mother in the near future.

. . .

Based on the above findings . . . , the Court finds that the State has carried its burden of proving by clear, cogent, and convincing evidence that the mother is currently unfit to parent her two children, [J-L.R. and L.R.].

Finally, under RCW 13.34.190, Subsection (1)(b), this Court must determine whether the termination of parental rights is in the children's best interest. . . .

The overwhelming evidence in this case . . . is that the mother is not presently able or capable of providing for these two children. She has a history of drug use, current diagnoses of significant mental health problems, and a long-term failure to address her parental deficiencies to be able to reunite and care adequately for her children. The mother has had an understanding of the need to address these deficiencies, an opportunity to access services to address these deficiencies, and has failed to adequately avail herself of the services to care and protect [J-L.R. and L.R.]. Additional time to allow the mother to access the services, which she has not followed through in the . . . past compromise and jeopardize the wellbeing of these two children. For this reason, the Court finds . . . it is in the best interest of [J-L.R. and [L.R.] to terminate the parental relationship with Laquisha Reed.[24]

The court subsequently entered written findings and conclusions and an order terminating Reed's parental rights.

Reed appeals.

---

[24] RP (September 30, 2016) at 671-83.

16

## TERMINATION

Parental rights are a fundamental liberty interest protected by the United States Constitution.[25] To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . . and
> (f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.[26]

If the State satisfies these criteria, the court may terminate parental rights if it finds by a preponderance of the evidence that termination is in the "best interests" of the child.[27]

---

[25] Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

[26] RCW 13.34.180(1).

[27] RCW 13.34.190(1)(b).

On review, unchallenged findings of fact are considered verities.[28] Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing . . . ."[29] Because the trial court hears the testimony and observes the witnesses, its decision is entitled to deference.[30] Consequently, we defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence.[31]

*Reasonably Competent Case Management*

Reed contends the court erred in terminating her parental rights because the Department failed "to establish by clear, cogent, and convincing evidence that the . . . social worker(s) provided reasonably competent case management throughout the dependency." The authorities she cites in support, however, do not require such proof for termination. Rather, they hold that where a dependency service would not be futile, delays or omissions in providing the service may undermine a finding that all necessary services were offered or

---

[28] In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

[29] In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

[30] In re Dependency of A.V.D., 62 Wn. App. 562, 568, 815 P.2d 277 (1991).

[31] A.V.D., 62 Wn. App. at 568; In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011); State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

provided as required by RCW 13.34.180(1)(d).[32] Accordingly, we review Reed's claims of caseworker incompetence in the context of the Department's burden to demonstrate the provision of all necessary services.

*Provision of Services Under RCW 13.34.180(1)(d).*

The trial court found that all court-ordered and necessary services were "expressly and understandably offered or provided," and that the Department proved this fact by clear, cogent and convincing evidence. Reed assigns error to the court's finding and conclusion, arguing that the Department failed to prove by clear and convincing evidence that it understandably referred Reed for the mental health treatment modalities -- DBT and CBT -- recommended by Dr. Shepel. We address each in turn.

*DBT*

To meet its statutory burden, the Department must, at a minimum, provide the parent with a referral list of agencies or organizations that provide the required services.[33] Under the clear, cogent and convincing evidence standard,

---

[32] In re Welfare of S.J.,162 Wn. App. at 881-84 (reversing termination due to Department's failure to timely provide court-ordered mental health service that might have helped the parent progress in other services at an earlier stage and would not have been futile); In re Dependency of T.L.G.,126 Wn. App. 181, 198-203, 108 P.3d 156 (2005) (where "protracted delay" in obtaining psychological evaluations was not "solely (or even mostly)" caused by the parents, there was no reason why mental health services could not be provided pending the evaluations, and there was no finding parents could not have benefitted from the services, the delay and "false premise that all other services should await the [evaluation] results" fatally undermined the court's finding that necessary services were offered); and In re Dependency of H.W., 92 Wn. App. 420, 426-30, 961 P.2d 963 (1998) (termination was premature where Department did not offer parent disability services and record did not support finding of futility).

[33] In re Welfare of Hall, 99 Wn.2d 842, 850, 664 P.2d 1245 (1983).

the Department carries its burden only if the evidence proves that the necessary facts are highly probable.[34] In this case, the evidence relating to the provision of DBT met that standard.

Caseworker Gordon testified she gave Reed verbal and written instructions on how to access services during both O.M.'s and the twins' dependencies. In the twins' dependency, Gordon testified that she specifically explained how to access the services recommended by Dr. Shepel and referred Reed to programs she knew from prior dependencies:

> Q. Okay. Do you ever recall speaking with her about the mental health services that were recommended by Dr. Shepel?
> A. Yes.
> Q. *And did you speak with her during any of those conversations about how to access those services recommended by Dr. Shepel?*
> A. *Yes.*
> Q. What do you recall speaking with her about?
> A. *About recommending services . . . to places that she was familiar with.* She had been to several of the places over the course of . . . her [dependency] cases . . . such as Valley Cities, Sound Mental Health, New Traditions.
> Q. Okay. *And specifically with regard to . . . mental health services, did you speak with the mother about Sound Mental Health for that service?*
> A. I don't recall a specific conversation.
> . . .
> A. But *if it was followed up in a letter . . . it was discussed with her.*
> Q. With the mother?
> A. Yes.[35]

---

[34] In re Welfare of M.R.H., 145 Wn. App. 10, 24, 188 P.3d 510 (2008).

[35] RP (September 7, 2016) at 554-55 (emphasis added).

Gordon testified that the services recommended by Dr. Shepel, including DBT, were available at Valley Cities, Navos Mental health Solutions, SMH, and New Traditions.

In a letter dated July 30, 2015, Gordon provided Reed with the addresses and phone numbers of the service providers. The letter, which Gordon mailed five months prior to the filing of the termination petition, expressly reminded Reed that she needed to engage in individual mental health counseling and *"Diabolical [sic] Behavioral Therapy (DBT)* . . . as soon as possible, as it has been identified as a good treatment to address the mental health concerns that impact your ability to safely parent."[36] In addition, Reed signed a June 2015 note that said: "Bus tickets *for Court ordered services DBT,* UA's, parenting education."[37] Gordon testified that Reed never expressed "any confusion about where she needed to go to do the services that were required by the court."[38] The fact that Reed had her initial meeting with her SMH case manager within a week of receiving the July 30, 2015 letter demonstrates her understanding of the referral and letter.

Reed's testimony corroborated Gordon's. When asked if at any point she "didn't understand how to access the services that were ordered by the Court,"

---

[36] Exhibit 17 (emphasis added).

[37] Exhibit 18 (emphasis added).

[38] RP (September 7, 2016) at 554.

Reed said "No."[39] She testified Gordon sent or handed her letters explaining how to access services and verbally told her she needed to engage in the services recommended in her psychological evaluation. Reed talked to Gordon "[a] lot" and contacted her "[e]very time I had a barrier out here in the field."[40] She also testified she had no difficulty understanding written materials given to her by a parent coach.

In short, the Department not only met the minimum threshold of providing Reed with a list of service providers for DBT, it did so both verbally and in writing. It also expressly and repeatedly reminded her that she needed to engage in mental health therapy in general, and DBT in particular. The record supports the court's finding and conclusion that DBT was expressly and understandably offered or provided as required by RCW 13.34.180(1)(d).

Reed argues, however, that the Department did not satisfy RCW 13.34.180(1)(d) because "neither Gordon nor Hurd made any effort to make reasonable accommodations" for Reed's cognitive limitations. The record does not support this claim, especially in light of the reactions the caseworkers received from Reed.

Gordon and Hurd testified they saw no indication that Reed was having difficulty understanding or accessing her service requirements. Both testified they were ready and willing to provide Reed with additional support, but she

---

[39] RP (August 30, 2016) at 286.

[40] Id. at 284.

never exhibited any confusion and affirmatively assured them she was engaged in her mental health services at SMH. Significantly, Reed herself testified that she understood how to access her services. Nevertheless, Gordon went to considerable lengths to ensure Reed's understanding of her services. She provided both written and verbal instructions on how to access services, hand delivered a number of service letters, selected service providers that Reed was familiar with from prior dependencies, provided services while she was incarcerated, made unscheduled in-home visits to check on Reed, and made persistent attempts to improve Reed's communication with Gordon and engagement in services. Reed confirmed Gordon's persistence, testifying that she spoke to Reed "a lot" and did so whenever she had difficulties. Likewise, Hurd repeatedly asked Reed about her participation in services and Reed assured her she was participating in services at SMH. Hurd also tried to obtain a written release from Reed to access SMH records, but it was difficult to do so given that their conversations were usually over the phone. The record thus belies Reed's argument.

Reed also argues that given her cognitive difficulties, the July 30, 2015 letter could and should have been clearer in connecting DBT with the listed service providers. We agree, but any deficiency in the letter was immaterial given (a) Gordon's testimony that she also verbally explained how to access the services recommended by Dr. Shepel, (b) Gordon's testimony that Reed expressed no confusion regarding accessing services, (c) Reed's testimony that

she had no trouble understanding how to access services and understood written materials, (d) Reed's considerable experience with the dependency process through prior dependencies, and (e) testimony that DBT was available at SMH had Reed requested it.

Reed next claims "[t]he State had a *statutory obligation* to offer court-ordered mental health services *and to actively coordinate with SMH to see that they were provided.*"[41] Reed cites no statutory authority supporting the emphasized portions of her contention. In any event, the record indicates that caseworkers Gordon and Hurd made efforts to communicate with Reed's service providers, including SMH, and did so despite Reed's repeated assurances that she was engaged in the required mental health services.

When asked if she followed up on the referrals to New Traditions and SMH, Patricia Gordon said "[y]es." Gordon testified that Reed told her she was "already doing those services." Gordon asked who she was seeing so Gordon could call them directly. Gordon said Reed gave her business cards of the providers she was allegedly seeing, and Gordon tried to contact them. But Gordon said "oftentimes" it turned out that Reed had just scheduled an appointment and picked up a business card but had not started services. Although Gordon did not recall specific conversations with Reed's case manager at SMH, she testified she "would have spoken to a case manager once [Reed] started her treatment." Gordon also testified that she contacts service providers

---

[41] (Emphasis added.)

before submitting dependency progress reports to the court, but Reed did not regularly provide the releases necessary for her to do that. Similarly, Hurd testified that Reed told her she was participating in services at SMH. Hurd asked for and received permission to speak with Reed's SMH provider and subsequently spoke with the provider by phone. The record does not support Reed's claim.

Last, Reed contends her caseworkers failed to ensure "that [she] understood the importance of these services." But Gordon testified that she explained to Reed "why she needed to participate in service[s]" and would have asked "whether she [had] any understanding of the services, and why she's engaged in those services." Gordon's letters, particularly the letter dated July 30, 2015, also emphasized the importance of Reed's services and their direct relationship to reunification with her children. The July 30, 2015 letter expressly referred to the "many conversations" Gordon and Reed had "about your services and re-engagement" in those services. Gordon also testified that there were times when Reed "was very clear about what she needed to do to reunify with her children, and how she was going to change her life and . . . engage in her treatment." Caseworker Hurd similarly testified that she spoke with Reed about the importance of her services and "the concerns that . . . are the basis of having her participate in the services." Reed's contention fails.

*CBT*

Whether the Department expressly and understandably offered or provided CBT is less clear. As noted above, Gordon testified that she verbally discussed with Reed how to access the services recommended by Dr. Shepel and Reed corroborated that testimony. But while Gordon's service letter and note expressly mentioned DBT, they did not mention CBT. Two service letters did expressly refer Reed to SMH and New Traditions for "Individual Mental Health Counseling," as recommended by Dr. Shepel. Since CBT is a modality of individual mental health counseling,[42] the letters arguably provide some evidence that CBT was implicitly offered or provided. But given Reed's cognitive impairment and the clear, cogent and convincing evidence standard, it is questionable whether this evidence amounts to substantial evidence that CBT was *understandably* offered or provided.

We need not decide that question, however, because "even where the State inexcusably fails to offer a service to a willing parent, . . . termination is appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future, which depends on the age of the child."[43] This means

---

[42] Dr. Shepel testified in part:

> Q: And you recommended with respect to *individual therapy* that she be offered cognitive behavioral therapy, correct?
> A: That's correct.

RP (September 7, 2016) at 493.

[43] In re Dependency of T.R., 108 Wn. App. 149, 164, 29 P.3d 1275 (2001).

26

that when the record establishes that an offer of services would have been futile, the trial court can make a finding that the Department has offered all reasonable services.[44] The record and findings in this case demonstrate that a more express offer of CBT would have been futile.

It is undisputed that Reed failed to complete the court-ordered services in any of her dependencies. In her "CASA Court Report" recommending termination, the CASA stated in part:

> . . . Ms. Reed has not engaged in services (other than a psychological evaluation) for two years in the current dependency case. She checked herself out of drug/alcohol treatment against medical advice in April 2014 and has not participated in court-ordered drug/alcohol treatment, random urinalysis testing or parenting classes since that date. While she did undergo a psychological evaluation in October 2014, Ms. Reed has not followed-up on any of the recommendations from that evaluation. Ms. Reed has also been unable to complete services in three other dependencies dating back to 2011, which has resulted in termination of her parental rights to her three older children.

> Ms. Reed has been unable to maintain a consistent visitation schedule for nearly a year at this point. She has missed multiple visits and has had her visitation contract cancelled for no-shows at least twice. She has also made and then missed appointments with other service providers. [The twins] are both high-needs children who require a parent or parents who can keep on top of various therapy and medical appointments and it is this CASA's opinion that Ms. Reed would find managing their care challenging. [J.L.] has life-threatening allergies and asthma that need constant vigilance and both children are enrolled in speech therapy.

> Finally, Ms. Reed's psychological evaluation shows that she will not be ready to successfully parent in the near future. In her report dated 10/26/2014, . . . [Dr.] Shepel . . . described Ms. Reed's

---

[44] In re Welfare of Ferguson, 32 Wn. App. 865, 869-70, 650 P.2d 1118 (1982), rev'd on other grounds, 98 Wn.2d 589, 656 P.2d 503 (1983).

prognosis for safely and appropriately parenting her children as "guarded to poor."[45]

In unchallenged findings, the court found that Reed failed to follow through with services:

> 2.10.3 Of the services ordered by the court, *Ms. Reed completed only the age appropriate parenting classes. . . [and] a neuro-psychological evaluation as described below.* She did submit to urinalysis testing but on a sporadic basis inadequate to determine whether she is currently using any non-prescribed drugs. . . .
>
> . . .
>
> 2.10.7 To date Ms. *Reed has not completed a court ordered chemical dependency program. . . .*[46]

A number of the court's challenged findings also demonstrate futility and are supported by substantial evidence:

> 2.10.12 . . . the mother's contact with Sound Mental Health was sporadic and inconsistent. Ms. Harrison attempted to make arrangements for Ms. Reed to receive medication management, participate in trauma management group, and referral for a mental health counselor. . . .
>
> 2.10.13 The mother did not follow through on arrangements that Ms. Harrison had made for her to participate in a trauma management group or with medication management. She also did not seek Ms. Harrison's help in obtaining housing information. . . .
>
> 2.10.14 The mother was given numerous opportunities to access these services, but she made sporadic and inconsistent efforts to follow through with obtaining these services and failed to follow through with substance abuse treatment and mental health counseling to completion.
>
> . . .
>
> 2.11.3 The mother has been in dependency proceedings with her various children since approximately 2008. She has been made

---

[45] Clerk's Papers at 28.

[46] Id. at 216 (emphasis added).

well aware through this dependency, as well as the previous dependencies, of the need for her to seriously and consistently address her parental deficiencies in order to obtain reunification with her children.

. . .

2.11.6 . . . Even assuming that this trial inspired Ms. Reed to proceed with sincerity in obtaining these services, the expert testimony at trial was that the mother would not likely complete services for another twelve to eighteen months. Though the mother may be sincere in her desire to work toward having her children return to her care, there are serious questions about both her motivation and her ability to follow-through in light of her failure to take advantage of the necessary services that were previously offered by the state and were not utilized during the prior or current dependencies.

2.11.7 Under the best case scenario, the mother could not address these deficiencies before a minimum of one year. However, given her previous failure to address her deficiencies in the prior dependencies, this court questions whether the mother would in fact be capable of doing so and following through to completion at this stage. Certainly for children of this young age who have never lived with their mother extending these dependencies for another year with the attendant risks would not create a likelihood that they could be returned to the mother in the near future.[47]

In addition, Reed's SMH case manager testified she told Reed she had referred her for weekly counseling with an SMH therapist. Despite that referral, no such counseling occurred. While SMH concedes it bears some responsibility for the failure of that referral to materialize, Reed bears responsibility given her knowledge of the referral and the underlying service requirement and her own inaction.

Finally, Hannah Harrison testified that Reed did not consistently attend appointments and that CBT would require consistent attendance. This had been

---

[47] Id. at 217-18.

Reed's weakness in other dependencies and was consistent with Dr. Shepel's testimony that her cognitive limitations did not preclude her from benefitting from services "if there is motivation to attempt and follow through." In her 2014 report, Dr. Shepel presciently concluded that Reed "may not benefit from services *because of very high level of resistance and denial, dishonesty, and also the history of relapses and quitting treatments, and not benefitting from previous treatments.*"[48]

The record thus supports a conclusion that a more express offer of CBT would have been futile and would not have remedied Reed's parental deficiencies within the foreseeable future.

In conclusion, clear and convincing evidence supports the trial court's finding that the Department understandably offered or provided Reed DBT. Assuming without deciding that the Department failed to understandably offer or provide CBT, provision of that treatment modality would have been futile.

We affirm the order terminating parental rights to L.R. and J-L.R.

Cox, J.

WE CONCUR:

Trickey, A.C.J.

---

[48] RP (September 7, 2016) at 478 (emphasis added).