FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 MAR 12 AM 8: 39

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of: | DIVISION ONE |
| T.M.P.-S., (DOB: 06/12/2014) | No. 76271-1-I |
| Minor child. | |
| LISA PURCELL, | UNPUBLISHED OPINION |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | |
| Respondent. | FILED: March 12, 2018 |

DWYER, J. – Lisa Purcell appeals from the trial court's order terminating her parental rights to her son, T.M.P.-S. Purcell contends that the State failed to prove that all necessary and available services capable of correcting her parental deficiencies were provided and that termination of her parental rights was in T.M.P.-S.'s best interests. Because substantial evidence supports the trial court's findings, we affirm the termination order.

I

Purcell is the mother of T.M.P.-S., born June 12, 2014. Purcell has a lengthy history of significant mental health issues, including diagnoses of schizophrenia, bipolar II disorder, posttraumatic stress disorder and borderline personality disorder. Purcell suffers from delusions, paranoia, and unpredictable mood swings that can include threats of violence. By the time T.M.P.-S. was born, six of Purcell's older children had been removed from her care pursuant to dependency proceedings.

In April 2014, while pregnant with T.M.P.-S., Purcell participated in a psychological evaluation in the dependency proceedings for her older child, B.S., who was then two years old.[1] Dr. JoAnne Solchany, a psychiatric nurse practitioner, noted that Purcell's thinking was very delusional and it was difficult to have a productive conversation with her.[2] Dr. Solchany also noted that Purcell was unable to read B.S.'s cues or recognize his needs, and that she would become hostile and aggressive towards B.S. if he did not do what she wanted him to do. As a result, B.S. avoided Purcell and would instead approach Dr. Solchany for recognition or interaction.

---

[1] B.S. was ultimately placed with his father and is not a subject of this appeal.

[2] Purcell's delusions frequently centered around conversations or relationships she believed she had with public figures such as Bill Clinton, Barack Obama, Jack Nicholson and the Central Intelligence Agency, or large sums of money she had received in lawsuits that had subsequently been stolen from her. Purcell also maintained ongoing paranoia that her apartment was contaminated by poisonous gases that were burning her skin and eyes, that her apartment would flood, or that people were breaking into her apartment.

Dr. Solchany opined that her concerns for Purcell were "so significant that I did not think she would be able to parent . . . in any appropriate way." She recommended that Purcell continue with mental health treatment. Dr. Solchany also recommended that a parenting coach be present at any parent-child visits, but she believed that Purcell would not be capable of assimilating the coach's suggestions and that the coach was primarily needed as protection for the children. Dr. Solchany testified that to assess Purcell's progress, she would consider "whether the mother's symptoms were under control, whether she demonstrated a consistent ability to think clearly, whether she was able to keep her outbursts under control, and whether she showed an ability to understand her child's needs and prioritize those needs."[3]

The juvenile court removed T.M.P.-S. from Purcell's care at birth. On August 29, 2014, Purcell agreed to dependency. The juvenile court ordered Purcell to "[c]ontinue following treatment recommendations of the current mental health treatment provider" and to participate in one-on-one parenting coaching.

Purcell told Department social worker Brittany Floyd that she had been receiving mental health services from Navos for over 20 years. Floyd testified that she believed that Purcell's mental health was her primary barrier to parenting and

---

[3] However, Dr. Solchany acknowledged that "sometimes finding the right medication and having that medication be affected – be effective for individuals who struggle with the kind of mental health symptoms that Ms. Purcell struggles with, can be really difficult. Even when you, kind of, manage some of those symptoms like the delusional thinking or the derailment, that they can think more clearly, there's still a lot of deficits for them."

3

that the court-ordered services were appropriate for her. However, Purcell frequently refused to discuss her mental health with Floyd because she did not believe that she needed mental health treatment.[4]

Liivan Yusuf was Purcell's individual mental health therapist at Navos from July 2014 to September 2016. Yusuf met with Purcell approximately once a month to provide counseling. Yusuf also served as Purcell's case manager. His responsibilities in this role included checking that Purcell was meeting with her psychiatrist and nurse practitioner, and offering her help obtaining other resources such as housing or health insurance. Purcell attended only about half of the scheduled appointments with Yusuf.

Yusuf testified that Purcell's mental health fluctuated during the time he worked with her. "[T]here were periods that she was more cooperative when she met with me, and there were periods that she was not able to sit for ten minutes with me." Purcell told Yusuf that sometimes she took her medication and sometimes she did not. Purcell also frequently made delusional statements, particularly involving Navos staff. Purcell believed that Navos's nurse practitioner had stolen her children, and threatened to kill Navos's front desk receptionist because she believed the receptionist was sneaking into her apartment and getting it dirty.

---

[4] Floyd was ultimately compelled to obtain a no-contact order against Purcell after Purcell made several threats to kill her.

Yusuf testified that Navos offered psychiatric treatment, individual and group therapy, case management, and public health services. Yusuf also testified that Navos offered the PACT[5] program, in which a "more assertive team" visits a client's home and "makes sure the person takes their medications and comes to their appointments." Yusuf agreed that Purcell likely would have benefited from this service. However, Yusuf testified that Purcell did not meet Navos's internal eligible criteria for PACT.[6] Yusuf believed Navos was providing Purcell "with all necessary and appropriate mental health services." He also testified that, in the three months prior to the termination trial, Purcell appeared more coherent and was coming to appointments more frequently. Nonetheless, he did not believe that Purcell had made any progress "developing insight into her mental health condition."

Neither did any of the other professionals working with Purcell over the course of the dependency proceedings see Purcell make the progress identified by Dr. Solchany. All of the Department's witnesses testified that Purcell's delusions interfered substantially with her perception of reality and that Purcell would regularly become combative or hostile. Joe McGovern, the court-appointed

---

[5] Program of Assertive Community Treatment

[6] Yusuf testified that the eligibility criteria for the PACT program was "someone who enters the hospital – psych hospitals frequently, within a year once or twice or three times, not adhering to medications after release, not adhering to counseling after release from the hospital, and also getting into trouble with the law."

special advocate (CASA) for T.M.P.-S., testified that he had never had an entirely coherent conversation with Purcell in over two years.

Furthermore, Purcell was often resistant to participating in mental health services. Purcell told Noemi Peredo, the Department social worker from April 2015 to January 2016, that she did not need mental health services or medication and that anyone who suggested she did was lying. Caitlyn Hynes, the Department social worker from January 2016 until the time of the termination trial, testified that Purcell insisted she "didn't have any mental health problems."

The Department consistently provided parent coaching to Purcell during her visits with both T.M.P.-S. and B.S. However, Purcell's mental health prevented her from benefitting from the parent coaching. Esther Patrick, an individual and family therapist who provided parent coaching for Purcell in January and February 2015, testified that Purcell's delusions and paranoia were so severe that she could not focus on the children during even a two-hour visit. Patrick did not believe that Purcell would ever benefit from parent coaching unless Purcell's mental health was better managed. Quinita Ellis, a licensed mental health counselor who provided parent coaching for Purcell from March 2016 until the termination trial, testified that Purcell refused to follow her suggestions to read to the children and to not physically discipline the children by slapping them. Ellis testified that Purcell did not make any significant progress despite her assistance.

In February 2016, the Department filed a termination petition. Following a request by the Department, the juvenile court found that Purcell was not able to

comprehend the significance of the proceedings and appointed a guardian ad litem for her.[7]

Trial on the termination petition began on November 3, 2016. By this time T.M.P.-S. was almost two and a half years old and had never resided with Purcell. Following the testimony of 12 witnesses and the admission of 36 exhibits, the trial court entered findings of fact and conclusions of law and an order terminating Purcell's parental rights. Purcell appeals.[8]

II

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate the parent-child relationship, the Department must prove each of the following six statutory elements by clear, cogent, and convincing evidence:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

---

[7] The juvenile court had previously appointed a guardian ad litem for Purcell in the dependency proceedings.

[8] The parental rights of T.M.P.-S.'s father were terminated by default on May 2, 2016 and he is not a party to this action.

> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . [; and]
>
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). If all of these elements are proven, the trial court must also find by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1).

We treat unchallenged findings of fact as verities. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown to be "'highly probable.'" In re Dependency of T.L.G., 126 Wn. App. 181, 197, 108 P.3d 156 (2005) (quoting In re Dependency of H.W., 92 Wn. App. 420, 425, 961 P.2d 963, 969 P.2d 1082 (1998)). We defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011).

III

Purcell contends that the Department failed to provide her with all necessary services to address her history of mental illness. However, the record demonstrates that Purcell was able to—and did—receive an array of mental health

services from Navos, where she had been a client for approximately 20 years. In addition, Purcell had received mental health services in at least three prior dependency proceedings. She does not challenge the following findings made by the trial court:

> 2.12 Services have been made available to the mother in three dependency actions prior to [T.M.P.-S.'s] dependency case. On 11/10/99 the juvenile court entered a default order of dependency as to the mother regarding her child [N.S.] (dob 8/28/99, case 99-7-03621-1 KNT). Dependency was based on facts including that mother's therapist at Highline Mental health reported that the mother was bi-polar but was not consistently taking her medication; the mother was using drugs and alcohol while pregnant, was not consistently engaged in prenatal care, had threatened to kill a social worker, that her psychological incapacity was chronic and severe, and that the mother's parental rights had been terminated as to three of her four older children (the fourth lived with their father). The court also entered a dispositional order which required the mother to engage in remedial services including obtain a drug/alcohol evaluation and follow recommended treatment, engage in random urinalysis testing, engage in mental health counseling, and obtain a psychological evaluation and follow treatment recommendations. On 5/18/00 the mother's parental rights to [N.S.] were terminated by default; the juvenile court found that the ordered services had been offered or provided to the mother, but she had not remedied her parental deficiencies.
>
> 2.13 On 2/13/02 the mother entered an agreed order of dependency as to her child [T.P.] (dob 8/24/01, case 01-7-03857-3 KNT). Dependency was based on agreed facts, including that the mother was in jail in the psychiatric unit, that she had a history of mental illness including psychotic features which had resulted in several hospitalizations at Western State, and that she was obtaining mental health services at Highline Mental Health. The mother entered an agreed dispositional order which required her to engage in remedial services including a drug/alcohol evaluation and follow recommended treatment, engage in random urinalysis testing, and engage in mental health counseling at Highline Mental Health. On 11/07/02 the mother's parental rights to [T.P.] were terminated via voluntary relinquishment.

2.14 On 8/27/13 the mother entered an agreed order of dependency as to her child [B.S.] (dob 3/24/11, case 13-7-11692-6 SEA). Dependency was based on agreed facts, including that on 4/25/13 the mother called CPS to report that she had been told by the police in 1999 to call CPS if she had any more children ([B.S.] was over two years old at this time), and the mother reported diagnoses of schizophrenia, bipolar disorder and mania; CPS investigated and learned that the child did not have a name or birth certificate and had not received any medical care; the mother reported that she had been receiving mental health treatment at NAVOS, but upon inquiry NAVOS reported that the mother had last received treatment there about 10 years prior; that the mother's significant mental health issues prevented her from safely parenting [B.S.] at that time. . . . The dispositional order required the mother to participate in remedial services of age-appropriate parenting instruction with a provider approved by the Department; obtain a psychiatric evaluation with parenting component and follow through with any treatment recommendations; and to continue following treatment recommendations of her mental health treatment provider.

Because Purcell does not challenge these findings of fact, they are verities on appeal.

Purcell contends that the services she received were insufficiently tailored to her parental deficiencies. She argues that Yusuf was an intern in 2014, when he began providing services to Purcell, and that he primarily provided case management, which was wholly inadequate to address her significant mental health needs. But Purcell's participation in the mental health services that were available to her was inconsistent. It is well-settled that "[w]hen a parent is unwilling or unable to make use of the services provided, DSHS is not required to offer still other services that might have been helpful." In re Dependency of T.R., 108 Wn. App. 149, 163, 29 P.3d 1275 (2001).

Purcell next assigns error to the trial court's finding of fact 2.23, in which the trial court found that PACT was not a reasonably available service because Purcell did not qualify for it.

> 2.23 During the dependency for [T.M.P.-S.], neither the mother, the CASA nor the Department have indicated the need for remedial services for the mother other than those contained in the dispositional order. At the termination trial the mother indicated that the Department should have provided the mother with the PACT program through NAVOS, however Mr. Yusuf indicated that qualification for PACT was an internal decision made at NAVOS and the mother did not qualify, because that service is utilized for persons who have been hospitalized for mental health issues and/or in frequent trouble with the law, and have not been compliant with treatment. The mother argued that the Department had not communicated adequately with NAVOS but both Ms. Peredo and Ms. Hynes testified to direct contact with that provider. Mr. Yusuf was aware that the mother was in danger of losing her children, and that she had made threats towards a NAVOS receptionist (Ms. Mathias) and that she suffered from delusions such believing Ms. Mathias had been in her home; there is no evidence that more information from the Department would have qualified the mother for PACT.

Purcell contends that this finding is not supported by substantial evidence. She points to evidence in the record that she had previously been hospitalized at Western State Hospital, that she had been found incompetent in a misdemeanor criminal matter, that she had threatened to kill social workers, service providers and T.M.P.-S.'s foster parent, and that she struggled to comply with managing her medications and attending treatment. Yusuf, who was aware of all of this information, nevertheless testified that Purcell did not meet Navos's internal criteria for PACT because "[s]he would need to be a lot more severe in her symptoms to qualify." Substantial evidence supported the trial court's finding.

11

Moreover, even if PACT were a reasonably available service, the record does not support a conclusion that it would have rectified Purcell's parental deficiencies. As the trial court noted, the PACT team could only make it easier for Purcell to take her medication. It could not force her to do so.

> Mother was not under a less restrictive alternative order or some other order from the involuntary treatment court that would have required her to take her medication. The mom sometimes chose to take the medication and sometimes chose not to. And I don't use the word "chose" in a pejorative sense. I understand that for someone who is significantly mentally ill, medication management is a huge issue, but this mother was not always compliant.

Finally, Purcell challenges finding of fact 2.28, in which the trial court found that "[t]hroughout the dependency the parent has been represented by counsel, and has had the opportunity to raise any concerns to the court via motion or at the periodic dependency review hearings." Purcell argues that this improperly shifted the burden to her to seek out services, instead of requiring that the Department offer or provide them. The record establishes to the contrary. In fact, the trial court was well aware that the Department bore the burden of proof to show that all services had been provided. The challenged finding simply establishes that there was no evidence of available services that had not been provided. This was not error.

IV

Purcell also challenges the trial court's finding that termination was in T.M.P.-S.'s best interest. The best interests of a child must be decided on the facts and circumstances of each case. In re Dependency of A.V.D., 62 Wn. App.

12

562, 572, 815 P.2d 277 (1991). A trial court is afforded broad discretion in making a "best interests" determination, and we give its decision great deference on review. In re Welfare of Young, 24 Wn. App. 392, 395, 600 P.2d 1312 (1979). Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is "'fully justified'" in finding termination in the child's best interests rather than "'leaving [the child] in the limbo of foster care for an indefinite period'" while the parent rehabilitates himself or herself. T.R., 108 Wn. App. at 167 (quoting In re Dependency of A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

Purcell contends that termination is not in T.M.P.-S.'s best interest because it was clear that she loved him and looked forward to their visits. She also asserts that mental illness is not, in and of itself, proof that she is an unfit or incapable parent. However, Purcell's mental health issues were so severe and intractable that no witness supported even brief unsupervised contact with T.M.P.-S. Furthermore, at the time of trial, T.M.P.-S. was almost two and a half years old and had never resided with Purcell. Both Hynes and McGovern testified that termination was in T.M.P.-S.'s best interest. The trial court did not err in finding that the State proved by a preponderance of the evidence that termination of Purcell's parental rights was in T.M.P.-S.'s best interest.

We affirm the trial court's order terminating Purcell's parental rights.

_____

We concur:

_____     _____