IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 76715-1-I |
| S.M.M., DOB: 04/01/2011, | ) ) | DIVISION ONE |
| R.I.A., DOB: 03/12/2002, | ) ) | UNPUBLISHED OPINION |
| Minor Children. | ) ) | FILED: July 23, 2018 |

COURT OF APPEALS DIV I STATE OF WASHINGTON 2018 JUL 23 AM 11:54 FILED

BECKER, J. – Angela Waldo appeals the trial court's order terminating her parental rights to her son, S.M.M. Waldo contends the State failed to prove that all necessary and available services capable of correcting her parental deficiencies were provided to her. Because substantial evidence supports the trial court's findings to the contrary, we affirm the termination order.

Waldo has two children: a daughter, R.I.A., born March 22, 2002, and a son, S.M.M., born April 1, 2011.[1] After a car accident in 2004, Waldo became addicted to opiate pain medication and benzodiazepines. She was observed on

---

[1] Waldo's parental rights to R.I.A. were terminated in a separate proceeding, and R.I.A. is not a subject of this appeal. The parental rights of S.M.M.'s father were terminated by default on October 12, 2015, and he is not a party to this action. Clerk's Papers at 191-96.

multiple occasions by school staff, social workers, and family members to be "'overly sedated' as evidenced by slurring speech and rambling, tangential conversations." Exhibit 2. Waldo's dental clinic noted that Waldo exhibited classic "drug-seeking behavior," including not completing dental work but still requesting painkillers, or becoming belligerent when she believed she was not given enough painkillers. Clerk's Papers at 121, Report of Proceedings (Nov. 30, 2016) at 247. Waldo also admitted to purchasing drugs from customers when she was working as a bartender.

In 2013, the Department of Social and Health Services filed a dependency petition after Waldo was arrested for driving under the influence with S.M.M. in the car. Waldo agreed to dependency, and the juvenile court ordered the following services: a substance abuse evaluation, random urinalysis testing, mental health counseling, parenting classes, and a psychological evaluation. Department social worker Michelle Hetzel explained to Waldo how to obtain these services and provided contact information for eight local inpatient substance abuse treatment facilities. However, Waldo "vehemently denied substance abuse issues" to Hetzel. Report of Proceedings (Dec. 6, 2016) at 580. She insisted that she had merely mixed up her prescription medications or that her babysitter had drugged her drinks. Nevertheless, Waldo began working with Community Psychiatric Clinic, an agency that provided Waldo with both outpatient substance abuse treatment and cognitive behavioral therapy. Waldo also began taking methadone as part of her substance abuse treatment.

In June 2014, Dr. Joanne Solchany conducted a psychological evaluation, including a parent-child observation. In her report, Dr. Solchany noted that Waldo seemed "frenetic" with her son, frequently asking him a question and then immediately asking another without giving him a chance to respond. Report of Proceedings (Nov. 30, 2016) at 161. Dr. Solchany also described Waldo as "demanding" and "intrusive." She stated that S.M.M. and R.I.A. seemed confused as to how to interact with her. Report of Proceedings (Nov. 30, 2016) at 162-63. Dr. Solchany diagnosed Waldo with generalized anxiety disorder and a personality disorder with mixed narcissistic, borderline, antisocial, and histrionic features. Dr. Solchany recommended that Waldo continue participating in cognitive behavioral therapy, manage her medication use, and engage in parent-child therapy with S.M.M.

Waldo argued that the parent-child evaluation went poorly only because the boy was tired. As a result, Dr. Solchany agreed to conduct a second parent-child observation in August 2014. However, Waldo exhibited the same behaviors as in the previous observation and was able to sustain positive interactions for only a few minutes at a time.

Dr. Solchany issued an addendum to her report in which she recommended that, instead of cognitive behavioral therapy, Waldo participate in a formal dialectical behavioral therapy program. Dr. Solchany explained that dialectical behavioral therapy is a specific, evidence-based therapy that is particularly helpful for individuals with personality disorders—particularly

3

borderline personality disorder—because it teaches skills such as emotional self-regulation and distress tolerance. Such a program frequently takes a year or more to complete.

Department social worker Tatiana Popov, who herself was trained in dialectical behavioral therapy, referred Waldo to a program at Harborview Mental Health. Joanne Marsden, the lead therapist at the Harborview program, testified that Waldo was not eligible because the Harborview program focused on suicidal ideation and self-harm behaviors, which were not an issue for Waldo. In addition, Marsden explained that because success in dialectical behavioral therapy is so dependent on internal motivation to change, Harborview did not accept individuals who were court-ordered to participate. Marsden gave Popov a list of other providers who offered this type of therapy. At the time, none of the Seattle-area providers accepted Waldo's Medicaid benefits; the nearest program that did was in Spokane. Waldo continued participating in dialectical behavioral therapy at Community Psychiatric Clinic.

In October 2014, S.M.M.'s caregivers asked that he be removed from their home. Over the department's objection, the juvenile court returned S.M.M. to Waldo's care, on the condition that Waldo participate in in-home parenting services and ensure that the boy attend a special education preschool to address developmental delays.

The placement was not successful. Waldo refused to participate in in-home services and struggled to get her son to preschool consistently, despite

having school bus transportation for him. On April 18, 2015, police responded to a call that Waldo appeared to be passed out in a parked truck with four-year-old S.M.M. in the back seat. When police knocked on the window, Waldo was difficult to rouse, incoherent, and unable to focus. Waldo denied being under the influence of drugs or alcohol and insisted she was merely tired. Police placed S.M.M. in protective custody.

In the weeks following the boy's removal, department social worker Cecelie Han noted several occasions when Waldo appeared impaired—not making sense and allowing her voice to trail off—including once while driving. The child's therapist, Erin Wentz, also described two similar phone calls in which Waldo appeared intoxicated. The department filed a petition to terminate Waldo's parental rights as to S.M.M.

By this time, Waldo had changed her outpatient substance abuse treatment to Therapeutic Health Services and her mental health services to Center for Human Services. She continued participating in both, though her participation was inconsistent. On November 12, 2015, Waldo tested positive for two nonprescribed benzodiazepines. Peggy Hopkins, Waldo's substance abuse treatment provider, was extremely concerned that Waldo could overdose from the combination of methadone and benzodiazepines. Hopkins urged Waldo to discontinue the methadone program and enter inpatient substance abuse treatment. Waldo refused.

Over the department's objection, the juvenile court placed R.I.A. with Waldo on March 28, 2016. The juvenile court wrote: "In the court's experience, repeated failed attempts to return children to their parents invariably cause great damage to the children. The court noted on the record and in the presence of the mother that this is the mother's last chance to demonstrate compliance and progress." Exhibit 20. Within days, Waldo's stepfather reported that Waldo's speech was slurred and incoherent. Waldo refused to submit a required urinalysis sample on April 8, 2016, and a sample on April 13, 2016, was positive for benzodiazepines. Waldo denied taking benzodiazepines and blamed the positive result on either incompetence at the laboratory or deliberate tampering by the department.

Despite this, on June 30, 2016, the juvenile court returned S.M.M. to Waldo for the second time. Again, however, Waldo was incapable of safely parenting her son. Diana Sonne, Waldo's family preservation services provider, observed that Waldo was extremely sleepy and could not respond to questions or hold an intelligible conversation. R.I.A. witnessed Waldo remove milk from the refrigerator, pour the milk into a bottle of Windex cleaning solution, and return the mixture to the refrigerator. Waldo denied that her erratic behavior was the result of drug use. She claimed she had suffered a head injury, but medical providers found no evidence of head trauma.

On September 2, 2016, police responded to a call and found Waldo slumped over in the driver's seat of her truck with the engine running. Waldo's

speech was heavily slurred, and her responses to police were nonsensical. She performed very poorly on field sobriety tests. Waldo admitted that she was on her way to pick up S.M.M. from camp. A blood test was positive for benzodiazepines, which Waldo was not prescribed. Waldo gave inconsistent explanations for the positive result. Her son was again placed in protective custody.

Waldo's substance abuse treatment provider again recommended that Waldo enter an inpatient substance abuse treatment program. Waldo replied that she did not "currently have a problem with the use of alcohol or drugs." Report of Proceedings (Dec. 1, 2016) at 286. However, Waldo acknowledged that "she would like to try something that could . . . benefit her more." Report of Proceedings (Dec. 2, 2016) at 293. On September 20, 2016, Waldo entered a six-month "dual diagnosis" inpatient program at Evergreen Recovery Center offering both substance abuse treatment and dialectical behavioral therapy. Though a dialectical behavioral therapy program typically takes a year or more to complete, Evergreen compressed the program into six months by doubling the number of treatment sessions per week.

On November 15, 2016, while at Evergreen, Waldo tested positive for benzodiazepines, which she was not prescribed.

Trial on the termination petition began on November 29, 2016. Due to the holidays and witness scheduling issues, the trial lasted more than two months. The following occurred while the termination trial was proceeding.

7

On December 15, 2016, Waldo was discharged from Evergreen. Julia Lugo, Waldo's chemical dependency counselor at Evergreen, testified that Waldo made an excessive number of doctor's appointments that interfered with her treatment requirements. Lugo attempted to work with Waldo so she could remain at Evergreen but told Waldo she would need to streamline her doctor's appointment. Waldo said, "That's not going to happen. . . . I at least need to go to the doctor once a week." Report of Proceedings (Dec. 19, 2016) at 1186-87. Following her discharge from inpatient substance abuse treatment, Waldo entered a "dual diagnosis" program at Valley Cities offering both outpatient substance abuse treatment and dialectical behavioral therapy.

On January 21, 2017, Waldo attended a visit with S.M.M. in which she appeared under the influence. Waldo stumbled, was unable to read a book to the child, made nonsensical comments and continually fell asleep. Waldo also fed the boy so much food that he threw up. Denise Huynh, the department social worker, asked Waldo to submit to a urinalysis test, but Waldo refused. Waldo's explanations of what happened were inconsistent and contradicted by the record. For example, Waldo claimed that she was still sleepy from a dental procedure that occurred on January 20. However, Waldo's primary care physician testified that Waldo would not have still been experiencing effects from the medication or procedure by January 21. Waldo then claimed that she was sleepy from having been assaulted by an acquaintance on January 20. However, medical providers who examined Waldo found no evidence of concussion or anything else that

8

could account for Waldo's behavior. Waldo testified that she would have canceled the visit but was unable to because her phone was broken. However, Huynh called and talked to Waldo the morning of January 21 to confirm the visit. The trial court specifically found Waldo's explanations not credible.

S.M.M.'s foster parent testified that S.M.M. said, "I'm calm here" and "[I]t was crazy . . . at my mom's house, I always felt crazy." Report of Proceedings (Nov. 29, 2016) at 40-41. The boy disclosed that Waldo was frequently "drowsy" and that made him "nervous and scared." Report of Proceedings (Nov. 29, 2016) at 53. S.M.M. told his foster parent that one time he had to throw water on Waldo's face to wake her up and he was afraid she was dead.

After hearing testimony from 36 witnesses and reviewing 63 exhibits, the trial court entered findings of fact and conclusions of law and an order terminating Waldo's parental rights. Waldo appeals.

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate the parent-child relationship, the department must prove each of the following six statutory elements by clear, cogent, and convincing evidence.

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . [; and]

. . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). If all of these elements are proven, the trial court must also find by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(1)(b).

We treat unchallenged findings of fact as verities. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). Challenged findings will be upheld "if there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). "Clear, cogent and convincing evidence exists when the ultimate fact in issue is shown to be 'highly probable.'" In re Dependency of T.L.G., 126 Wn. App. 181, 197, 108 P.3d 156 (2005), quoting In re Dependency of H.W., 92 Wn. App. 420, 425, 961 P.2d 963, 969 P.2d 1082 (1998). We defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

Waldo contends that the department did not satisfy its burden of providing all necessary services under RCW 13.34.180(1). Specifically, she argues that the department failed to provide her with dialectical behavioral therapy until approximately two years after Dr. Solchany recommended it.

The department has a statutory obligation to provide all the services ordered by the permanency plan, as well as "'all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future.'" In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75 (2016), quoting RCW 13.34.180(1)(d). "Necessary services" are those services "needed to address a condition that precludes reunification of the parent and child." In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014).

Here, substantial evidence in the record supports the trial court's finding that dialectical behavioral therapy was offered or provided to Waldo. In 2014, Popov referred Waldo to Harborview, which determined she was not eligible for their program. At the time, no other Seattle-area dialectical behavioral therapy programs accepted Medicaid. However, in 2015, two did: Sound Mental Health and Valley Cities. Catie Wilkins, Waldo's mental health therapist at Center for Human Services between August 2015 and August 2016, testified that she explained how Waldo could transfer to one of these programs, but Waldo declined to do so. Waldo testified that she believed she would lose the

opportunity to participate in parent-child therapy with her son if she changed her mental health provider. Several witnesses testified that this was not the case.

Waldo contends that reversal is required because the department inexcusably failed to procure funding to pay for a dialectical behavioral therapy program. Had it done so, she argues, she could have entered the program earlier and demonstrated progress by the time of the termination trial. But Waldo's claim is belied by the undisputed fact that when a program became available to her in 2015, she chose not to participate. Waldo also argues that the department did not comply with RCW 13.34.025(2)(c), which provides that if "court-ordered remedial services are unavailable for any reason, including lack of funding," that the department "shall promptly notify the court that the parent is unable to engage in the treatment due to the inability to access such services." But Waldo does not demonstrate that the department failed to inform the juvenile court as required. Nor does Waldo cite to any authority that such a failure would mandate reversal of a termination order.

Moreover, a trial court may find that the department has offered all reasonable services if the evidence shows that the offer of such services would be futile. K.M.M., 186 Wn.2d at 483. "The provision of services is futile where a parent is unwilling or unable to participate in a reasonably available service that has been offered or provided." K.M.M., 186 Wn.2d at 483. Marsden, Popov, and Dr. Solchany all testified about the rigorous nature of a dialectical behavioral therapy program. The record showed that Waldo was rarely in full compliance

with any of her services. Denise Huynh testified that she did not push harder for Waldo to do dialectical behavioral therapy because Waldo claimed she was already overwhelmed by the services she was doing, to the point that she was unable to get R.I.A. to medical or mental health appointments. And Waldo does not challenge the following findings:

> The mother declined to participate in the in-home service with Jennifer Perez that was offered to her because she was too busy. The mother participated in the in-home service provided by Cindy Irwin mid-November 2014-December 2014 but cancelled at least 8 in-home appointments and consistently expressed that she was overwhelmed with too many appointments . . . .
> . . . .
> . . . The mother attended approximately 60% of her scheduled sessions with [mental health therapist] Ms. Wilkins.

Clerk's Papers at 118-19, 124. These uncontested findings were sufficient to support the trial court's finding that "the evidence regarding the mother's participation in her other services demonstrates that she would most probably not have attended or participated in the service of [dialectical behavioral therapy] with the regularity and dedication needed . . . to profit from that service." Clerk's Papers at 126.

Waldo argues that the department also failed to offer her inpatient substance abuse treatment at the beginning of the dependency proceedings, when it would have been most helpful. This claim is contradicted by the record. Waldo declined inpatient substance abuse treatment at almost every opportunity in the dependency proceedings. When Hetzel, Waldo's first department social worker, suggested inpatient substance abuse treatment, Waldo denied that she

13

had a substance abuse problem. When Hopkins, Waldo's substance abuse treatment provider in 2015 and 2016, offered Waldo assistance getting into inpatient treatment, Waldo refused. Han, the department social worker in 2015 and 2016, testified that she recommended inpatient treatment to Waldo, but Waldo "told me that she did not abuse substances." Report of Proceedings (Dec. 7, 2016) at 829. Micah Kurtz, a department supervisor, testified that Waldo had continually denied having a substance abuse problem "as long as I'd known her." He said, "I don't know of many people who go to inpatient treatment when they don't acknowledge a substance abuse issue or other natural consequences in their life that are leading them to that." Report of Proceedings (Nov. 29, 2016) at 113.

Nevertheless, Waldo appears to argue that the department should have asked the juvenile court to order her to participate in inpatient substance abuse treatment. But Jennie Lindberg, the clinical director for residential treatment at Evergreen, testified that determining the appropriate level of care is "a medical diagnosis" that must be made by a chemical dependency professional and "the court can't assign people to inpatient or outpatient." Report of Proceedings (Dec. 5, 2016) at 453. Waldo's claim that the department should have advocated for her to remain at Evergreen is similarly unavailing, in light of the testimony that Waldo was not in compliance with her treatment there.

Finally, citing In re Termination of S.J., 162 Wn. App. 873, 256 P.3d 470 (2011), Waldo argues that the department failed to offer services "specifically

14

tailored to address her co-occurring mental health conditions and substance abuse." In S.J., the mother struggled with both substance abuse and mental health issues. A dispositional order required that the mother achieve sobriety before beginning mental health services. Consequently, the department did not refer the mother to mental health services until late in the dependency proceedings, after the mother had unsuccessfully attempted to complete inpatient substance abuse treatment three times. Once the mother began addressing her mental health issues, she was able to successfully complete inpatient substance abuse treatment. Division Three of this court held that her inability to complete substance abuse treatment was a result of untreated mental health issues and that she would have been able to remedy her parental deficiencies if she had been offered mental health treatment sooner.

Waldo's reliance on S.J. is misplaced. Here, the department did not intentionally withhold mental health services until Waldo addressed her substance abuse. Waldo simultaneously received mental health and substance abuse services throughout the dependency proceedings.

We affirm the trial court's order terminating Waldo's parental rights to S.M.M.

Becker, J.

WE CONCUR:

15